419 S.E.2d 870

**TXO PRODUCTION CORP., a Delaware Corporation Licensed to do Business in West Virginia, Appellant,**

v.

**ALLIANCE RESOURCES CORP., a Texas Corporation Licensed to do Business in West Virginia; Tug Fork Land Company, a West Virginia Corporation; George King, an Individual; and Grover C. Goode, an Individual, Appellees.**

No. 20281.

Supreme Court of Appeals of West Virginia.

Submitted March 10, 1992.

Decided May 14, 1992.

459

Timothy R. Miller, Charles R. McElwee, Robinson & McElwee, Charleston, for appellant.

G. David Brumfield, Wade T. Watson, David L. White, Sanders, Watson & White, Bluefield, for appellee.

NEELY, Justice:

In this case, TXO Production Corporation, a subsidiary of USX, knowingly and intentionally brought a frivolous declaratory judgment action against the appellees to clear a purported cloud on title. TXO's real intent, however, was to reduce the royalty payments under a 1,002.74 acre oil and gas lease. Appellees counterclaimed alleging that TXO's actions were a slander of appellees' title. TXO now appeals the verdict against it for $19,000 in compensatory damages and $10,000,000 in punitive damages assigning three primary errors: (1) no cause of action for slander of title exists in West Virginia, and even if it does, the appellees did not prove the essential elements of slander of title at trial; (2) the circuit court erred in admitting testimony of lawyers involved in suits against TXO in other states to show plan, knowledge and intent in contravention of the *West Virginia Rules of Evidence;* and (3) the award of punitive damages in this case is a violation of due process as enunciated in *Haslip v. Pacific Mutual Life Ins. Co.,* —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) and *Garnes v. Fleming Landfill,* 186 W.Va. 656, 413 S.E.2d 897 (1991). We find no reversible error in the lower court's conduct of the trial and, because appellant and its agents and servants failed to conduct themselves as gentlemen, we decline to enter a remittitur. Thus, we affirm.

I.

This case centers in the oil and gas development rights to 1,002.74 acres in McDowell County known as the "Blevins Tract." Tug Fork Land Company manages the Blevins Tract. In 1984, Tug Fork leased the oil and gas development rights to George King, doing business as Georgia Fuels. Mr. King in turn assigned his lease to Alliance Resources Corporation, reserving an overriding royalty interest to Georgia Fuels.

In late 1984, TXO became interested in the oil and gas in the Blevins Tract and approached Brian Robinson, the president and chairman of the board of Alliance Resources, about purchasing Alliance's rights in the Blevins Tract. Mr. Robinson declined to sell Alliance's interest outright but did propose a joint venture in which TXO would pay 75 percent of the drilling costs and Alliance Resources would pay 25 percent. Under this arrangement, Tug Fork would receive a 12.5 percent royalty, Georgia Fuels would receive a 6.25 percent royalty, and Alliance Resources would receive a 1 percent royalty, for a total royalty burden of 19.75 percent. TXO and Alliance would then share an 80.25 percent working interest. TXO rejected this proposal.

Only a few months later, in February, 1985, however, TXO approached Mr. Robinson with a much better offer. TXO offered to pay all of the drilling costs, pay 22 percent in royalties, *and* pay Alliance $20 per acre for its interest in the Blevins Tract. Mr. Robinson accepted what he considered to be such a "phenomenal offer." [1]

TXO then retained the Ripley law firm of Skeen and Skeen to examine the title to the

---

1. The pertinent parts of the 2 April 1985 agreement state:

The interest in said leases assigned Assignee hereunder shall be subject to such interest's proportionate part of the royalty interest as provided for in said leases and to the terms, conditions and provisions set forth therein. Such interest shall also be subject to such interest's proportionate part of all overriding royalties, production payments and any other payments and agreements of record.

This Assignment is further made expressly subject to the following:

(1) Assignor reserves unto itself, its successors and assigns, an overriding royalty interest equal to the difference between existing lease burdens and twenty-two percent (22%) of all of the oil, gas and other liquid or gaseous hydrocarbons produced and saved from or attributable to said leases during the terms thereof; provided, however, that the overriding royalty interest herein reserved shall be proportionately reduced if any of said leases do not cover a full mineral interest and/or this Assignment does not convey full leasehold rights in any of said leases. The overriding royalty interest reserved hereby shall

Blevins Tract. According to the title report prepared by the Skeens, there was a problem with a 1958 deed from Tug Fork to Leo J. Signaigo, Jr.[2] TXO's agent, Duncan Wood, then contacted Mr. Signaigo who told him that the 1958 deed did not include the transfer from Tug Fork to Mr. Signaigo of rights to the oil and gas. Nevertheless, shortly thereafter Mr. Wood approached Mr. Signaigo with a pre-printed affidavit for Mr. Signaigo to sign. The affidavit *falsely* stated that Mr. Signaigo could not say whether the oil and gas rights were included in the 1958 deed. The complete contents of the tendered affidavit are as follows:

My name is Leo J. Signaigo, Jr. and I am involved in the coal business. On September 2nd, 1958, I purchased the coal and other minerals under certain tracts of real estate from Tug Fork Land Company. A copy of this deed is attached hereto and incorporated herein for all purposes. However, *there was no specific agreement on the part of myself or Tug Fork Land Company as to whether or not the oil and gas would be reserved by Tug Fork Land Company* in the attached deed, other than in the Pocahontas No. 3 and No. 4 coal seams. Therefore, *I did not know whether or not the oil and gas was included in the conveyance to me* and as a consequence, after I purchased this mineral property, I was assessed for 1,002.74 acres, mineral or timber, Hensley Creek. *In the event Tug Fork Land Company would claim that we had a specific agreement that the oil and gas was not to be conveyed under any of the properties, I could not agree with such conclusions as there was not such a specific agreement.* Further affiant saith not. (Emphasis added.)

Because the affidavit was false, Mr. Signaigo refused to sign it.

The pertinent parts of the 1958 Signaigo deed state:

1. That for and in consideration of the sum of One ($1.00) Dollar, cash in hand paid, and other good and valuable considerations not herein set forth, the receipt and sufficiency of all of which is hereby acknowledged, the said party of the first part does hereby bargain, sell, grant and convey unto the said party of the second part, with covenants of special warranty of title, all the coal and other minerals and mineral substances in, on and underlying the following tracts or parcels of land, situate in Browns Creek District, McDowell County, West Virginia, together with the mining rights and privileges hereinafter set forth, but subject to the exceptions, reservations, stipulations and agreements hereinafter set forth, to-wit:

[A description of the Blevins tract is included here.]

\* \* \* \* \* \*

6. It is understood and agreed that there is excepted and reserved to the party of the first part, its successors, assigns and lessees, the right to mine and remove all of said No. 3 and No. 4 Pocahontas seams of coal, together with the right to bore for and remove all the oil and gas underlying said tracts, such rights, however, to be used in common with the party of the second part and so as to interfere as little as possible with the mining operations of the party of the second part.

Although the deed does not demonstrate the most artful drafting, it does *clearly reserve all of the oil and gas under the Blevins Tract to Tug Fork Land Compa-*

bear its proportionate part of all production, severance or other similar taxes.

(2) Assignor hereby warrants title to the extent that in the event of conducting title examination of the assigned acreage, Assignee's examining attorney determines that title has failed to all or any part of the assigned acreage, Assignor will reimburse to Assignee the consideration paid to it for any such lands to which title is determined to have failed.

2. Mr. Signaigo later conveyed his interest in the coal rights to Pocahontas Empire (now doing business as Hawley Coal Mining Corporation), which in turn conveyed its interest to Virginia Crews Coal Company.

ny.[3] To make it perfectly clear why this Court so unequivocally finds that the deed was unambiguous, we include the entire deed as Appendix A.

Having decided that there was either a real or a contrived problem with title to the oil and gas, and still without having brought the potential problem to the attention of any of the appellees, TXO paid $6,000 to Virginia Crews (*see* note 2, *supra*) in exchange for a quitclaim deed that was recorded 11 July 1985. TXO told none of the appellees about any possible defect in title until *after* it had recorded its quitclaim deed.

After recording its quitclaim deed, TXO held a meeting on 14 or 15 August 1985 (the date is inconsistent in the record), attended by several of its employees, the title lawyer Mr. Larry Skeen, and Mr. Brian Robinson. The parties disagree about what occurred at this meeting. Mr. Robinson testified that during this meeting, Mr. Skeen very aggressively explained to him why the lease by Alliance Resources was not valid under West Virginia law. Mr. Robinson also testified that TXO asked for concessions and that TXO threatened to file suit if the appellees did not make concessions on the royalties. On the other hand, Mr. Skeen testified that, although "[he did not] remember what all we went over," he did not tell Mr. Robinson that Alliance didn't have title. Mr. Wood, a TXO landman, testified that TXO did not ask for any concessions on royalties at this meeting.

In the case before us no one disputes that before beginning to drill, any reasonable businessman would want to clear up any clouds on the title to the oil and gas rights, no matter how small. Therefore, we understand that before investing hundreds of thousands of dollars in an exploratory well on the Blevins Tract, TXO would have wanted to fork out $6,000 for an insurance policy against litigation in the form of a quitclaim deed. However, instead of clearing the title directly by making the grantee of the quitclaim Tug Fork or approaching the appellees to discuss the title problem, TXO attempted to use the purported cloud as leverage for increasing its interest in the oil and gas rights.

Shortly after the 14 or 15 August meeting, on 23 August 1985, TXO filed its action for a declaratory judgment to quiet title. The appellees counterclaimed alleging slander of title. The circuit court then bifurcated the issues for trial. In the declaratory judgment action, the circuit court found the terms of the 1958 deed from Tug Fork to Mr. Signaigo to be clear and unambiguous and held that title to the oil and gas was vested in Tug Fork as leased to Alliance Resources through George King. On the counterclaim, a jury awarded appellees $19,000 in compensatory damages and $10,000,000 in punitive damages.

## II.

### A.

TXO argues that there is no action for slander of title in West Virginia. Although there is no West Virginia case on record directly recognizing an action for slander of title, the *West Virginia Constitution,* Article VIII, Section 13, provides:

> Except as otherwise provided in this article, such parts of the common law, and of the laws of this State as are in force on the effective date of this article and are not repugnant thereto, shall be and continue the law of this State until altered or repealed by the legislature.

Also, *W.Va.Code,* 2–1–1 [1923] provides:

> The common law of England, so far as it is not repugnant to the principles of

---

**3.** According to Theodore M. Streit, Director, Oil and Gas Division of Environmental Protection, West Virginia Department of Commerce, Labor and Environmental Resources, a deed for the oil and gas underlying the Pocahontas 3 and 4 seams of coal would have been ridiculous in 1958. Gas wells are drilled much deeper than coal seams, and while modern gas recovery technology does, on occasion, lead producers to recover the methane imbedded in specific seams of coal, that would never have been done in 1958. Thus, any reading of the reservation clause which would imply that the grantor reserved only the oil and gas within the Pocahontas 3 and 4 seams of coal would have been ridiculous and contrary to all custom and usage at the time the deed was executed.

the constitution of this state, shall continue in force within the same, except in those respects wherein it was altered by the general assembly of Virginia before the twentieth day of June, eighteen hundred and sixty-three, or has been, or shall be, altered by the Legislature of this state.

Interpreting these provisions, we stated in Syllabus Point 2 of *Morningstar v. Black & Decker Mfg. Co.*, 162 W.Va. 857, 253 S.E.2d 666 (1979):

> Article VIII, Section 13 of the West Virginia Constitution and W.Va.Code, 2–1–1, were not intended to operate as a bar to this Court's evolution of common law principles, including its historic power to alter or amend the common law.

Although we recognized the ability of this Court to alter and amend the common law in *Morningstar*, we certainly did not imply that the common law was in any way abrogated as it stood. Quite to the contrary, the *West Virginia Constitution* commands that we recognize the English common law as of 1863.[4] Recognizing this fact, we now look to the common law.

Slander of title long has been recognized as a common law cause of action. Indeed, the slander of title cause of action was especially important 400 years ago when many transfers of land were oral transfers (i.e., feoffment with livery of seisin), and when, the Domesday Book notwithstanding, land records were much less complete than they are today. In the 32nd and 33rd years of Elizabeth I (c. 1591), the Queen's Bench found for the plaintiff on a claim of slander of title in *Gerrard against Dickenson*, 78 Eng.Rep. 452. Although 400 years old, *Gerrard* has some similarities to the case before us. The defendant claimed that she had a lease on the land of the plaintiff, which she did not have. The defendant offered several objections, but the court found for the plaintiff.

Later, in the 5th year of James I (c. 1608) the King's Bench also found for a plaintiff on a slander of title claim in *Earl of Northumberland against Byrt*, 79 Eng.Rep. 143. In *Byrt*, the defendant falsely said that the previous owner of the land in question had made a lease of it before his death. The defendant also claimed that the lease had then been conveyed to him. The court found this actionable as slander of title and held for the plaintiff. Examining these cases, it is clear that an action for slander of title has been a part of English common law for at least 400 years.

The one possible defense for TXO that these cases raise, however, is that "if a man claim estates [as his own], although they be false he shall not be punished." *See Pennyman against Rabanks*, 78 Eng. Rep. 668 (c. 1596). TXO maintained strenuously at oral argument that only allegations that title is held *by a third party* are actionable and that a person cannot slander title by asserting title in himself. Originally, falsely claiming title for oneself was not actionable as slander of title. However, at least by the end of the 16th century, the English courts had begun to do away with the distinction between claiming title in oneself and alleging the superior title of another. As discussed *supra*, unrecorded conveyances were much more important 400 years ago and the courts, therefore, sought to protect those who asserted unrecorded conveyances to themselves. In *Pennyman*, for example, the court stated:

> This was agreed by all the Court, that no action lay against one for saying, that he himself had title or estate in lands, & c. although it were false. But here the words in the declaration, as they are spoken, being in the third person, be not intendable of himself, but of some other, and import a slander to the plaintiff's title; and then his justification afterwards shall not take away that action which before was given to the plaintiff for the slandering of his title.—Wherefore rule was given that judgment should be entered for the plaintiff, unless other matter was shewn upon the third day of the next term.[5]

---

**4.** The common law in effect in West Virginia is traditional English common law, as amended by the Virginia legislature prior to 1863 and as amended by the West Virginia legislature.

**5.** First stating the rule and then neatly side-

A distinction between claiming title in oneself and claiming title in another arises for a logical reason. Although we want to discourage people from slandering the title of others, we do not want to discourage people from making legitimate (though possibly weak) claims of their own. Therefore, we also distinguish between cases in which the claimant legitimately raises questions of title in himself and cases in which the claimant raises his own claim without any reasonable grounds. Although the courts of the 16th and 17th centuries had not yet clearly enunciated this distinction, they did follow it. The courts circumvented the general rule whenever the defendant had not acted in good faith. Consider *Gerrard, supra,* in which the defendant falsely claimed a lease on land as her own. Notwithstanding the defendants' objection that she could not slander title by claiming it in herself, the court found for the plaintiff because the defendant relied on a deed that she knew had been forged. When, therefore, a defendant knows that his claim is false, he cannot rely on the defense of claiming title in himself.

■ Because of the *West Virginia Constitution*'s incorporation of the common law of England, we find that an action for slander of title could always be brought in West Virginia.[6] We also find that claiming title in oneself without any reasonable basis can give rise to a claim for slander of title.

### B.

■ The *Restatement (Second) of the Law of Torts* (1977) provides the guidelines that modern courts generally follow in identifying the elements of slander of title. *Restatement (Second) of the Law of Torts* § 623A (1977) provides:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

stepping it, the Court of Common Pleas demonstrates that judicial double talk was not pioneered in the 20th century.

> (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

> (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

*Restatement (Second) of the Law of Torts* § 624 (1977) provides:

> The rules on liability for the publication of an injurious falsehood stated in § 623A apply to the publication of a false statement disparaging another's property rights in land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary harm to the other through the conduct of third persons in respect to the other's interests in the property.

From the Restatement, we can deduce the elements of slander of title:

1. publication of
2. a false statement
3. derogatory to plaintiff's title
4. with malice
5. causing special damages
6. as a result of diminished value in the eyes of third parties.

*See also* W.P. Keeton, Prosser and Keeton on Torts (5th ed. 1984 at § 128); *Williams v. Burns,* 540 F.Supp. 1243 (D.Colo.1982). Although perhaps more neatly set out, these are the same elements required at least as far back as *Gerrard* in 1591.

### C.

■ The jury found that by recording a quitclaim deed which it knew to be frivolous, TXO satisfied the requirements for slander of title. TXO argues that recording a quitclaim deed cannot be construed as the publication of a frivolous statement with the intent to prevent others from dealing with the claimant as required for an action for slander of title. We disagree. Recording a quitclaim deed that one knows

**6.** The Fourth Circuit Court of Appeals has also determined that slander of title is a recognized cause of action in Virginia. *See Lomah Elect. Targetry v. ATA Tr. Aids Aust. Pty.,* 828 F.2d 1021 (4th Cir.1987).

to be frivolous is no different from saying to a potential purchaser—"I don't think you should buy that land. You know there is a cloud on the title because of Mr. Signaigo's old deed." Therefore, we agree with the Supreme Court of Montana which stated in a slander of title action in *Jumping Rainbow Ranch v. Conklin*, 167 Mont. 367, 373, 538 P.2d 1027, 1030 (1975):

> [T]he action of [the defendant] in filing his quitclaim deed was such as to warrant the necessary showing of malice to entitle plaintiff to punitive damages.

As a general rule, courts have found that wrongfully recording an unfounded claim to the property of another is actionable as slander of title. *See, e.g.,* Annotation, "Recording of Instrument Purporting to Affect Title as Slander of Title," 39 A.L.R.2d 840, and cases cited therein. This is so provided that the other elements for slander of title, namely malice and special damages, are present.

■ Even if (unlikely as this may be) the circuit court had found that there was a legitimate cloud on the title because of the deed to Mr. Signaigo, TXO (as an expert in all aspects of land law) undoubtedly knew that a tenant in possession under a lease is estopped from denying the title of his landlord. *See* Trial transcript at 614 (testimony of TXO's agent, Duncan Wood, confirming, in a general way, that he was aware at the time that such a rule existed.) As we said in *Voss v. King*, 33 W.Va. 236, 239, 10 S.E. 402, 405 (1889):

> [A] tenant in possession under a lease is not permitted to dispute the title of his landlord. This as a general principle of law is well settled both in England and in this country.

Although it has been a number of years since we have addressed the issue, the well-settled general rule is still that:

> [D]uring the existence of the relation of landlord and tenant, the tenant is estopped to deny his landlord's title. 49 Am.Jur.2d Landlord and Tenant § 109 (1970).

If, however, an honest mistake had arisen and TXO had mistakenly taken the quitclaim deed from Virginia Crews in its name instead of Tug Fork's name (but had not filed a suit against the appellees to challenge the title of TXO's own landlord while still in possession and claiming under the lease), the counterclaim for slander of title would never have arisen. Certainly, a jury would not have found malice in TXO's actions.

■ At trial, and again on appeal, TXO argued that there was no malice in its actions, and that the filing of the false quitclaim deed was the result of a good faith mistake. However, after the testimony about TXO's efforts to reduce royalty payments and much testimony about previous similar bad acts by TXO (*see,* Section III, *infra*), the jury found the requisite malice. The testimony regarding the August meeting is conflicting, and when we examine conflicting testimony, we look to Syllabus Point 3 of *Walker v. Monongahela Power Company*, 147 W.Va. 825, 131 S.E.2d 736 (1963), where we stated:

> In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.

Furthermore, TXO's employee, Duncan Wood, testified that TXO never made a request to Alliance for simple reimbursement of the expenses in acquiring the quitclaim deed. *See* Trial transcript at 618. This leads to the logical inference that TXO's real intent was to negotiate substantially lower royalties with appellees, thus reducing the market value of the appellees' interest in the lease in the eyes of any prospective third party purchasers. Therefore, we take Mr. Robinson's version of these events as accurate.

Not only do the details of the August meeting as related by Mr. Robinson suggest malice on the part of TXO, but the facts of Mr. Woods' dealings with Mr. Signaigo also show unsavory and malicious practices by TXO. When examined in the light most favorable to the appellees, the

evidence clearly shows that TXO intentionally and maliciously recorded a quitclaim deed that *it knew to be without any basis in fact* because Mr. Signaigo explicitly told TXO that he had not bought the oil and gas on the Blevins Tract in 1958. Furthermore, the record shows that this was not an isolated incident on TXO's part—a mere excess of zeal by poorly supervised, low level employees—but rather part of a pattern and practice by TXO to defraud and coerce those in positions of unequal bargaining power *vis a vis* TXO's superior legal firepower.

■ TXO argues that the $19,000 in attorneys' fees incurred by the appellees in defending against TXO's suit to remove the cloud from appellees' title are not special damages. Ordinarily, attorneys' fees are not considered damages. However, slander of title is a special case. The appellees spent $19,000 responding to TXO's declaratory judgment action that the appellees would not have spent if TXO had not filed the false quitclaim deed and then sued the appellees in an attempt to steal their land. We follow the clear majority rule in holding that attorneys' fees incurred in removing spurious clouds from a title qualify as special damages in an action for slander of title. *See, e.g., Rayl v. Shull Enterprises, Inc.,* 108 Idaho 524, 700 P.2d 567 (1984); *Summa Corp. v. Greenspun,* 98 Nev. 528, 655 P.2d 513 (1982); *Paulson v. Kustom Enterprises, Inc.,* 157 Mont. 188, 483 P.2d 708 (1971); *Dowse v. Doris Trust Co.,* 116 Utah 106, 208 P.2d 956 (1949); *Chesebro v. Powers,* 78 Mich. 472, 44 N.W. 290 (1889); *Den–Gar Enterprises v. Romero,* 94 N.M. 425, 611 P.2d 1119 (Ct.App.1980), *cert. denied,* 94 N.M. 628, 614 P.2d 545 (1980). *See also Restatement (Second) of the Law of Torts,* § 633 (1977).[7]

7. Section 633 states:

(1) *The pecuniary loss for which a publisher of injurious falsehood is subject to liability is restricted to*
 (a) the pecuniary loss that results directly and immediately from the effect of the conduct of third persons, including impairment of vendibility or value caused by disparagement, and

## III.

### A.

TXO's second group of assignments of error involve the introduction, as part of appellees' case in chief, of certain testimony about prior bad acts perpetrated by TXO. One of TXO's defenses at trial was good faith or the lack of malice. The appellees introduced testimony by four lawyers, under Rule 404(b) of the *West Virginia Rules of Evidence* [1985], to help establish a lack of good faith by TXO. TXO claims that the introduction of this evidence was a violation of Rules 404(b), 402, 403 and 802 of the *West Virginia Rules of Evidence* [1985].

The testimony at issue are the videotaped depositions of R.H. Madden, III, a Ruston, Louisiana lawyer; Clarence Buford Harrison, Jr., a Richardson, Texas lawyer; James P. Pruitt, a lawyer from Dallas and, Allan DeVore, a lawyer from Oklahoma City. The circuit court thoroughly examined each of these depositions before trial and excluded some parts of the testimony to which TXO had objected.

Mr. Madden testified about litigation that he initiated against TXO for his client Carrie Calloway. Ms. Calloway is an elderly, functionally illiterate woman who lives in Louisiana. Her son contacted Mr. Madden because he believed that TXO was taking gas from his mother's land without paying her for it. Near the end of February, 1988, Mr. Madden contacted John Wright in TXO's Shreveport office and informed him that he was representing Ms. Calloway. Mr. Madden testified that on 4 March 1988, David McDonald and Kevin Treadway, representatives of TXO, came to Ms. Calloway's house to discuss her interest in the gas TXO had been producing.

 (b) *the expense of measures reasonably necessary to counteract the publication, including litigation to remove the doubt cast upon vendibility or value by disparagement.*
(2) This pecuniary loss may be established by
 (a) proof of the conduct of specific persons, or
 (b) proof that the loss has resulted from the conduct of a number of persons whom it is impossible to identify. (Emphasis added.)

Ms. Calloway told the TXO representatives that they should contact Mr. Madden. However, the TXO representatives told Ms. Calloway that neither she nor they needed to talk to Mr. Madden, and that all she needed to do was sign some papers or else her neighbors could not continue to receive their royalty payments. Not wanting to prevent her neighbors from receiving money that was rightfully theirs, Ms. Calloway signed the tendered document. Ms. Calloway could not read this document and the TXO representatives did not leave her a copy of it. Ms. Calloway told Mr. Madden that the gentlemen were at her house about 1:00 p.m. on 4 March 1988. At 2:21 p.m. that same day, a lease (which was the tendered document) was filed in the local clerk of court's office. Subsequently, TXO settled the case favorably to Ms. Calloway.

Mr. Harrison testified about some wells in Texas in which he owned an interest. He testified that TXO had been producing from his wells for almost a year without paying him any royalties. He stated:

> They had given us a list of excuses a mile long of why they hadn't paid. *One of them was we don't know if the title's good to the tract. Well, our tract was where the well was located and that title was cured before the well was drilled.*
>
> Well, they gave us excuse after excuse after excuse. When we got the bill we figured they owed us 150 or $200,000. And our part of the frack job was about $50,000, so we figured since they owed us more than we owed them we weren't going to pay them.
>
> Never forget one day my partner, I was in his office, and he was registered agent for the company and a lawyer from TXO called and said we are going to sue you for that $50,000. And he said, well, good. And the comment from the lawyer on the other end of the phone was, you don't seem too upset. And he said, well, you're going to look awful silly suing us for 50,000 when you owe us 200,000. The lawyer then got a little

bit upset about that and decided to go ahead and pay.

Trial transcript at 265 (Emphasis added.)

Mr. Harrison also testified that, in another case, TXO under-reported the gas it had produced from a well, and therefore failed to pay the royalties it should have paid.

Mr. Pruitt, an oil and gas lawyer, testified about litigation he had instituted (personally and on behalf of clients) against TXO in 1984. After investigating the situation, Mr. Pruitt discovered that TXO had been paying minimal shut-in royalties to him and others, when in fact, TXO had been producing out of his well and other wells.[8] Shortly after the lawsuit was filed, Mr. Pruitt testified, TXO settled the case.

Mr. DeVore testified about some ongoing litigation in Oklahoma. He had examined depositions, discovery requests, interrogatories and other documents in the office of the county clerk where the litigation was taking place. He explained that there was a tract of land on which TXO wanted to drill. Under Oklahoma law, there was a procedure through which any owner of land within a tract could gain drilling rights. TXO initiated this procedure, although it did not own any of the land. In essence, TXO sent a letter to a group of landowners saying TXO was going to drill a well and individual landowners could either get in on it or not. However, TXO had no right to drill without the landowners' permission, and no right to send this letter. Through this questionable tactic, TXO was able to acquire an interest from one of the existing owners, and by acquiring this interest through fraud and misrepresentation, go on to drill the well it had threatened to drill.

Mr. DeVore also testified about a pending case, *Freede v. Texas Oil and Gas Corp. and TXO Production Corp.* From the court documents available to him (or to any other member of the public), Mr. DeVore testified that he *thought* "that TXO had violated the rights of Dr. Freede and

---

**8.** In many oil and gas contracts, the producer (in this case, TXO) agrees to pay a minimum royalty to the landowner even when the well is not producing. These are called shut-in royalties.

hundreds or thousands of other people across the nation, as a result of this willful, wanton action." Trial transcript at 315. He also explained the details of the then-pending lawsuit by Dr. Freede. After the trial of appellees' case here in West Virginia, however, an Oklahoma jury *found for TXO* in the case brought by Dr. Freede.

### B.

TXO argues that all of the testimony discussed in subsection A above should have been excluded under Rule 404(b) of the *West Virginia Rules of Evidence* [1985]. Rule 404(b) of the *West Virginia Rules of Evidence* [1985] provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In *Huddleston v. U.S.*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), the U.S. Supreme Court discussed the admission of "other acts" evidence under Rule 404(b) of the *Fed.R.Evid.* The Court held that "other acts" evidence need not be proved by a preponderance of the evidence before it can be submitted to the jury. The Court stated:

> "[S]uch evidence should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act."

*Id.* at 685, 108 S.Ct. at 1499.

The Court also stated:

> "Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, *especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.*" *Id.* (Emphasis added.)

The Court held that the first inquiry a trial court must make is whether the proffered evidence is probative of a material issue other than character. The Court also found that protection against unfair prejudice emanates from four sources:

> [F]irst, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; second, from the relevancy requirement of Rule 402—as enforced through Rule 104(b); third, from the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice ... and fourth, from *Fed.R. of Evid.* 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted. ...

*Id.* at 691–92, 108 S.Ct. at 1502.

We find the U.S. Supreme Court's reasoning in *Huddleston* persuasive and we here use its analysis to examine the admission of the other acts evidence in the case before us. Examining the first requirement, the testimony was offered in this case to prove malice, which is a necessary element in an action for slander of title. TXO strenuously maintained at trial that no matter how the facts appeared in this case, it had simply made a good faith mistake. The appellees offered their evidence of other evil acts to disprove TXO's good faith defense and to show that this case was but part of a pattern and practice of deception and chiseling by TXO.

For the second requirement, we look to Rules 401 and 402 of the *West Virginia Rules of Evidence* [1985]. Rule 401 of the *West Virginia Rules of Evidence* [1985] provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Rule 402 of the *West Virginia Rules of Evidence* [1985] provides:

> All relevant evidence is admissible, except as otherwise provided by the Consti-

tution of the United States, the Constitution of the State of West Virginia, these rules, or other rules adopted by the Supreme Court of Appeals. Evidence which is not relevant is not admissible. The proffered evidence was clearly relevant to the issue of malice. Furthermore, as we stated in Syllabus Point 2 of *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983):

> " 'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, [171 W.Va. 639], 301 S.E.2d 596, 599 (1983)."

For the third requirement, we look to Rule 403 of the *West Virginia Rule of Evidence* [1985] which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

And we recently stated in *Gable v. The Kroger Co.*, 186 W.Va. 62, 67, 410 S.E.2d 701, 705 (1991):

> Rules 402 and 403 of the *West Virginia Rules of Evidence* [1985] direct the trial judge to admit relevant evidence, but to exclude any evidence the probative value of which is substantially outweighed by the danger of unfair prejudice to the defendant. Such decisions are left to the sound discretion of the trial judge....

In this case, we find that the trial judge was correct in holding that any unfair prejudice to TXO did not substantially outweigh the probative value of the testimony.

Fourth, TXO did not request a limiting instruction regarding the other acts testimony. Therefore, we find this other acts evidence was appropriately admitted under Rule 404(b) of the *West Virginia Rules of Evidence* [1985].

TXO makes particular note of the testimony by Mr. DeVore about the *Freede*

case from Oklahoma because that case was subsequently won by TXO.[9] The fact that a jury found for TXO in *Freede* does not mean that any of the particular facts to which Mr. DeVore testified is untrue. More importantly, TXO had an opportunity to cross-examine Mr. DeVore, and also had an opportunity to put on testimony of its own to contradict Mr. DeVore. Furthermore, we find that, given the weight of the other testimony, any error in admitting Mr. DeVore's testimony about the *Freede* case was harmless.

### C.

More problematic than TXO's vociferous objections to admission of all of this testimony under Rule 404, is that particular parts of this testimony were based on hearsay. *West Virginia Rule of Evidence* 801(c) provides:

> (c) *Hearsay.*—"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

*West Virginia Rule of Evidence* 802 provides:

> Hearsay is not admissible except as provided by these rules.

Apparently, at the deposition, appellees' attorney offered this testimony believing it to be protected by the hearsay exception codified in Rule 803(6) of the *West Virginia Rules of Evidence* [1985]. Rule 803(6) of the *West Virginia Rules of Evidence* provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the

---

**9.** Well, even a blind hog finds an acorn now and again.

method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Most jurisdictions have held that this exception is applicable only when the hearsay declarant is under a business duty to provide the information. *See, e.g., United States v. Bortnovsky,* 879 F.2d 30 (2nd Cir.1989); *Ramrattan v. Burger King Corp.,* 656 F.Supp. 522 (D.Md.1987); *White Indus., Inc. v. Cessna Aircraft Co.,* 611 F.Supp. 1049 (W.D.Mo.1985); and *City of Cleveland v. Cleveland Elec. Illuminating Co.,* 538 F.Supp. 1257 (N.D.Ohio 1980). In the case before us, the out-of-court declarants were *not under a business duty* to provide the information. However, we need not decide the admissibility of the testimony under the business records exception because the testimony is admissible under Rule 803(24) of the *West Virginia Rules of Evidence* [1985].

The purpose of excluding hearsay testimony at trial is to prevent unreliable information from reaching the jury. Because not all statements that are hearsay as defined by Rule 801(c) of the *West Virginia Rules of Evidence* [1985] are unreliable, we have incorporated a number of specific traditional common law hearsay exceptions (such as the business records exception) into Rules 803 and 804 of the *West Virginia Rules of Evidence* [1985]. Rules 803(24) and 804(b)(5) also provide "catch-all" exceptions to cover other reliable hearsay statements.

Rule 803(24) of the *West Virginia Rules of Evidence* [1985] provides:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C)

the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

 Interpreting Rule 804(b)(5) of the *West Virginia Rules of Evidence* [1985], the counterpart to Rule 803(24) of the *West Virginia Rules of Evidence* [1985], in Syllabus Point 5 of *State v. Smith,* 178 W.Va. 104, 358 S.E.2d 188 (1987), we stated:

The language of Rule 804(b)(5) of the *West Virginia Rules of Evidence* and its counterpart in Rule 803(24) requires that five general factors must be met in order for hearsay evidence to be admissible under the rules. First and most important is the trustworthiness of the statement, which must be equivalent to the trustworthiness underlying the specific exceptions to the hearsay rule. Second, the statement must be offered to prove a material fact. Third, the statement must be shown to be more probative on the issue for which it is offered than any other evidence the proponent can reasonably procure. Fourth, admissions of the statement must comport with the general purpose of the rules of evidence and the interest of justice. Fifth, adequate notice of the statement must be afforded the other party to provide that party a fair opportunity to meet the evidence.

As we stated in *Smith,* our major concern with any evidence admitted under this exception is its reliability. We find the hearsay statements within the testimony of the four lawyers both credible and reliable. The hearsay statements were made about specific people, places, and events—all of which TXO controlled the evidence to controvert, if the witnesses' statements were not true. For instance, Mr. Madden testi-

fied about a specific day and time on which specific TXO employees went to visit Ms. Calloway and how TXO committed specific acts. TXO could have called its own employees, and Ms. Calloway for that matter, to disprove the statements, but it chose not to do so.

Second, as we explained above, this evidence is clearly probative of the material issue of whether TXO acted with malice.

Third, because of the concise manner in which the evidence was presented, because of the ease with which any untrue testimony could have been impeached, and because of the difficulty of appellees' obtaining any other evidence on this material issue, we find that these statements were more probative than any other evidence that the appellees could have reasonably procured.

Fourth, the admission of these statements comports with the general purpose of the *West Virginia Rules of Evidence* [1985] and the interests of justice.

Fifth, TXO clearly had more than adequate notice that these statements were going to be offered at trial. The hearsay statements were not offered live, but in previously prepared videotaped depositions. TXO was represented by its lawyer at each of these videotaped sessions. If there were any evidence available to rebut the statements made by these four witnesses, TXO had more than an ample and fair opportunity to provide that evidence. Thus, to the extent that appellees attempted to show the jury where TXO's victims' bodies were buried, each body allegedly buried was meticulously marked by time of death and tombstone location well in advance of trial.

Therefore, we find that the trial court did not abuse its discretion in admitting the "other acts" evidence under Rule 404(b) of the *West Virginia Rules of Evidence* [1985], and that the hearsay statements within this testimony were admissible under Rule 803(24) of the *West Virginia Rules of Evidence* [1985].

## IV.

TXO finally asks that we set aside the punitive damages award. The first issue that we must consider in this regard is the applicability of *Garnes v. Fleming Landfill*, 186 W.Va. 656, 413 S.E.2d 897 (1991) to those cases still on appeal that were decided before we handed down our decision in *Garnes*. TXO would have us remand this case for a new trial on the punitive damages issue because all of the technical requirements set forth in syllabus points 3 and 4 of *Garnes* were not met. To adopt such an approach to *Garnes* would unnecessarily send far too many cases back for retrial. We will, however, be especially diligent in our review of any punitive damages awards entered before *Garnes* was decided. We adopt this flexible approach to *Garnes* because we have already held that petitions for review of punitive damages awarded before 5 December 1991 must:

"Address each and every factor set forth in syllabus points 3 and 4 of [*Garnes*] with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage."

Syllabus point 5, *Garnes v. Fleming Landfill*, 186 W.Va. 656, 413 S.E.2d 897 (1991).

In Syllabus Point 3 of *Garnes*, we stated:

When the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows:

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.

(2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his ac-

tions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

(3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.

(4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

(5) The financial position of the defendant is relevant.

In Syllabus Point 4 of *Garnes,* we stated:

When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:

(1) The costs of the litigation;

(2) Any criminal sanctions imposed on the defendant for his conduct;

(3) Any other civil actions against the same defendant, based on the same conduct; and

(4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

Because not all relevant information is available to the jury, it is likely that in some cases the jury will make an award that is reasonable on the facts as the jury know them, but that will require downward adjustment by the trial court through remittitur because of factors

that would be prejudicial to the defendant if admitted at trial, such as criminal sanctions imposed or similar lawsuit pending elsewhere against the defendant. However, at the option of the defendant, or in the sound discretion of the trial court, any of the above factors may also be presented to the jury.

We set out these guidelines to provide both procedural and substantive due process to defendants against whom punitive damages are awarded in accordance with the U.S. Supreme Court's directive in *Haslip, supra.* Just as we recognized in *Garnes* that there can be no mathematical bright line relationship between punitive damages and compensatory damages, we cannot simply examine these nine criteria seriatim, awarding a certain number of points to each. The *Garnes* factors are interactive and must be considered as a whole when reviewing punitive damages awards.

Originally, punitive damages were awarded only to deter malicious and mean-spirited conduct. However, the punitive damages definition of malice has grown to include not only mean-spirited conduct, but also extremely negligent conduct that is likely to cause serious harm.[10] Generally, then, we can distinguish between the "really mean" punitive damages defendant, and the "really stupid" punitive damages defendant. We want to discourage both forms of unpleasant conduct, but not necessarily with the same level of punitive damages.

Although there is no mechanical mathematical formula to use in all punitive damages cases, we think it appropriate here to offer some broad, general guidelines concerning whether punitive damages bear a reasonable relationship to actual damages.

We have examined all of the punitive damages opinions issued since *Haslip* was decided in an attempt to find some pattern in what courts find reasonable. Generally, the cases fall into three categories: (1)

10. Even if Ford Motor Company had not intentionally left gas tanks in the wrong position on its Pinto automobile, we would still want to allow high levels of punitive damages against Ford in order to encourage Ford to make reasonable efforts to insure that bureaucratic bungling and red tape would not lead to the deaths of consumers. *See, Grimshaw v. Ford Motor Co.,* 119 Cal.App.3d 757, 174 Cal.Rptr. 348 (1981).

really stupid defendants; (2) really mean defendants; and, (3) really stupid defendants who could have caused a great deal of harm by their actions but who actually caused minimal harm.[11]

By really stupid defendants, we signify those defendants who have not harmed victims intentionally, but have harmed them as a result of extreme carelessness—in most cases caused by a foul-up in the middle of some corporate bureaucracy that has pushed some victim into a red-tape limbo. Consider, for example, *Principal Financial Group v. Thomas*, 585 So.2d 816 (Ala. 1991), *cert. denied* —— U.S. ——, 112 S.Ct. 649, 116 L.Ed.2d 666 (1991), in which an insurance company spent tens of thousands of dollars at trial and on appeal to defend its failure to pay $1,000 to a mother who had lost her child. The insurance company claimed that the child was not really a dependent of the mother. Outraged at the insurance company's conduct, the jury awarded not only $1,000 in compensatory damages, but also $750,000 in punitive damages. The Supreme Court of Alabama (whose review procedure was endorsed by the U.S. Supreme Court in *Haslip, supra*) upheld the verdict.

As we discussed in *Garnes*, one of the reasons we allow punitive damages in these "stupid" cases is to give individual plaintiffs a sword with which to fight well-armored, bureaucratic defendants. In a world with only smaller, closely held businesses, we would not need punitive damages for this type of case. Once Joe, the owner of Joe's Automobile Company, realizes that there is a foul up in his business that is causing problems for his customers, he has plenty of incentive to correct it. However, compensatory damages do not always provide sufficient incentive for the middle managers who make these types of decisions for a major automobile company with hundreds of thousands of employees and agents. As we noted in discussing claims against insurance companies in *Hay-*

*seeds, Inc. v. State Farm Fire & Cas.*, 177 W.Va. 323, 352 S.E.2d 73 (1986):

> Unfortunately, in the business of claims settlement we do not have simply two parties—the company that wishes to pay the lowest legitimate amount of money and the policyholder who wants maximum benefits under the policy. Between these two profit-maximizing, rational players, there is an entire corporate bureaucracy composed of agents, administrators, corporate counsel, and local litigating lawyers. This bureaucracy is neither inherently good nor inherently evil, and it performs a necessary function in the insurance industry. Nonetheless, the claims settlement bureaucracy is subject to the same dynamics as every other bureaucracy known to man: its natural tendency is to maximize upward mobility for middle management members of the bureaucracy and to augment the work that the bureaucracy is responsible for doing. In government, this phenomenon is often referred to as "turf protection." The extent to which pernicious dynamics prevail in any particular company's claims bureaucracy differs from company to company and from office to office within the same company. However, a policyholder who runs into an intransigent or unreasonable claims settlement bureaucracy is destined to be sorely put upon.

The threat of litigation is good news to the middle management employees who make many of the day-to-day decisions for large corporations. (Litigation causes work which increases middle management job security.) The possibility of punitive damages, however, increases the possibility of a higher payout. The higher the potential payout, then, the further up the corporate hierarchy the decision is passed. A reasonable level of punitive damages therefore increases the likelihood that settlement decisions will be made by upper management employees who own stock in

---

11. See our tables of cases in Appendix B. Although it is sometimes difficult to distinguish between the mean cases and the stupid cases just by reading the appellate opinion, we have given it our best efforts. For example, if we

tried to place the *Thomas* case, discussed *infra,* into a category, we could have called it a mean case or we could have said that it was only the worst case of bureaucratic bungling in history.

the company or who at least feel a higher level of fiduciary duty to the stockholders.

By really mean defendants, we signify those defendants who intentionally commit acts they know to be harmful. For example, in *Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377 (5th Cir.1991), which we discussed in *Garnes*, the defendant insurance company failed to pay Ms. Eichenseer's obviously *legitimate* claim. Ms. Eichenseer was subjected to numerous "misinterpretations" of her claim as well as the "loss" of her medical records. Furthermore, the insurance company made no effort to pay Ms. Eichenseer's claim until *after* she filed her lawsuit. The Fifth Circuit then upheld punitive damages 500 times the compensatory damages.

We cannot say that our examination of post-*Haslip* cases has led us to a crystal clear bright line rule. Not surprisingly, some courts have been less willing than this Court in *Garnes* to take seriously the U.S. Supreme Court's guidance. We do find a pattern, however, of what we believe are reasonable verdicts under the *Haslip* and *Garnes* standards.

▅▅▅ In cases in which the defendant falls into the really stupid category, and compensatory damages are neither negligible nor very large (*see* our discussion of those terms in *Hayseeds, supra*) we hold that the outer limit of punitive damages is *roughly* five to one.

This is not necessarily the case, however, when compensatory damages are minimal. In cases such as *Hospital Authority of Gwinnett County v. Jones*, 261 Ga. 613, 409 S.E.2d 501 (1991), in which the potential for harm from the defendant's conduct was tremendous, but the actual compensatory damages were negligible, punitive damages in a ratio much greater than five to one were entirely appropriate.[12]

When the defendant is not just stupid, but really mean, punitive damages limits must be greater in order to deter future evil acts by the defendant. For instance,

the United States Supreme Court upheld a punitive damages award with a ratio of more than 117 to 1 in *Browning–Ferris Industries v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). In the really mean cases, the cynosure in determining the reasonableness of the jury's verdict under *Haslip* and *Garnes* is the amount of punitive damages required to cause the defendant to mend its evil ways and to discourage others similarly situated from engaging in like reprehensible conduct.

Accordingly, we find that in cases where the defendant has intentionally committed mean-spirited and harmful acts (especially when the provable compensatory damages are small, but the potential of harm is great), even punitive damages 500 times greater than compensatory damages are not *per se* unconstitutional under *Haslip* and *Garnes*. The appropriateness of such awards depends on what it reasonably takes to attract the defendant's attention because, as we said in *Garnes*, an award that might be unreasonable if awarded against Jeff's Neighborhood Hot Dog Stand could be quite reasonable if awarded for the same conduct against McDonald's. *See Garnes*, 186 W.Va. at 670, 413 S.E.2d at 910.

▅▅▅ In applying the *Garnes* "reasonable relationship" test to the case before us, we look to: (1) the potential harm that TXO's actions could have caused; (2) the maliciousness of TXO's actions; and (3) the penalty necessary to discourage TXO from undertaking such endeavors in the future. The type of *fraudulent* action *intentionally* undertaken by TXO in this case could potentially cause millions of dollars in damages to other victims. As for the reprehensibility of TXO's conduct, we can say no more than we have already said, and we believe the jury's verdict says more than we could say in an opinion twice this length. Just as important, an award of this magnitude is necessary to discourage

---

**12.** Concomitantly, if the compensatory damages are very high then punitive damages even in the ratio of 5:1 might be excessive. *See, e.g., Mason v. Texaco, Inc.*, 948 F.2d 1546 (10th Cir.1991)

(compensatory damages of $9.025 million; punitive damages remitted to $12.5 million from $25 million).

TXO from continuing its pattern and practice of fraud, trickery and deceit.

TXO also argues that the jury were allowed to consider irrelevant financial information under the fifth criterion from Syllabus Point 3 of *Garnes*. By interrogatory, appellees attempted to find out about the finances of TXO Production Corp.[13] Because the appellees were unable to obtain information about the worth of TXO Production Corp. from TXO, the appellees provided their own expert to testify about the worth of the TXO Division of USX. Using public financial statements for USX, the expert testified that the net worth of the TXO Division of USX was between $2.2 billion and $2.5 billion. TXO argues that because the TXO division is "comprised of at least 15 corporate entities in addition to TXO Production Corp." (Appellant Brief at 37), the introduction of this testimony was unfairly prejudicial.

First, TXO was not forthcoming during discovery with information about the worth of TXO Production Corporation, nor did TXO offer such evidence at trial. Furthermore, even lingering on this point obscures the more important issue. The worth of the TXO Division of USX, and the worth of USX for that matter, is relevant. If we did not allow trial judges in their sound discretion to admit evidence of the worth of parent corporations, corporations could escape liability simply by incorporating separate departments as a number of undercapitalized subsidiaries. It is the management of USX that must ultimately make the decision that its employees will not engage in malicious and nefarious business activities, and, therefore, it is the pocketbook of USX that the jury verdict must reach.[14] Consequently, we find that the punitive damages awarded in this case were not so unreasonable as to demonstrate such passion and prejudice that a new trial is warranted.

## V.

The jury in this case correctly found willful and deliberate injury. Accordingly, the judgment of the Circuit Court of McDowell County is affirmed.

Affirmed.

## APPENDIX A

THIS DEED, made and entered into this the 2nd day of September, 1958, by and

---

**13.** Appellees 4th Set of Interrogatories Nos. 5, 6 and 7, along with TXO's answers are as follows:

5. State the name and address of the stockholders of TXO Production Corp.

ANSWER: Texas Oil & Gas Corp. owns 100% of outstanding stock.

> 1700 Pacific Avenue
> First City Center
> Dallas, Texas 75201

6. Since 1980 to present has TXO Production Corp. filed a separate corporate tax return?

ANSWER: No.

7. Since 1980 have the profits and/or losses of TXO Production Corp. been subsumed in or as a part of income tax returns of another corporation?

ANSWER: Not sure of term "subsumed". Dictionary definition would not appear to apply. If by term it is meant made part of or incorporated into parent company, the answer is yes.

If so,

(A) State the name and address of any corporation in which the profits and/or losses of TXO Production Corp. were subsumed, and the year or years in which each such corporate entity has subsumed the profits and/or losses of TXO Production Corp.

ANSWER: 1980–86—Texas Oil & Gas Corp.

> 1986–Present—USX Corporation
> 600 Grant Street
> Pittsburgh, PA 15230

(B) Defendant requests plaintiff produce copies of each of the above tax returns since 1980 in which the profits and/or losses of TXO Production Corp. have been incorporated and attach the same with your answers hereto.

ANSWER: Objection. The returns are too large and burdensome to copy and include. Moreover, they also combine the income and losses of a number of other companies (subsidiaries), but are not broken down on the returns by subsidiary and TXO's profit or loss could therefore not be determined by a review of such returns. Nothing short of a full audit at extreme expense could answer interrogatory which TXO is not prepared to do at its own cost.

**14.** When pressed at oral argument, TXO's counsel admitted that USX has the power to: 1) elect the Board of Directors, 2) appoint all officers through the Board, and 3) generally control the operations of TXO Production Corp. Indeed, it is undisputed that at the end of the chain of related companies, TXO has but one stockholder, to-wit USX.

between TUG FORK LAND COMPANY, a West Virginia corporation, party of the first part, and LEO J. SIGNAIGO, Jr., party of the second part.

### WITNESSETH:

1. That for and in consideration of the sum of One ($1.00) Dollar, cash in hand paid, and other good and valuable considerations not herein set forth, the receipt and sufficiency of all of which is hereby acknowledged, the said party of the first part does hereby bargain, sell, grant and convey unto the said party of the second part, with covenants of special warranty of title, all the coal and other minerals and mineral substances in, on and underlying the following tracts or parcels of land, situate in Browns Creek District, McDowell County, West Virginia, together with the mining rights and privileges hereinafter set forth, but subject to the exceptions, reservations, stipulations and agreements hereinafter set forth, to-wit:

*PARCEL NO. 1:* That certain tract or parcel of real estate on upper Hensley Branch, McDowell County, West Virginia, more particularly bounded and described as follows:

BEGINNING at a spruce pine on a spur about 300 feet West of Upper Hensley Branch, and 500 feet from Tug River, a corner of the Alex Trent 50½ acre tract; thence by a line running in a northeasterly direction parallel with and 20 feet below the outcrop of the Davy seam of coal, 2050 feet to a point in a line of the Alex Trent 50½ acres; thence with a part of one line of the A. Trent 50½ acres, S. 19 W. 1040 feet to a fallen spruce pine and maple; thence with one line of the A. Trent 50½ acres, S. 38 30 W. 1056 feet to the place of BEGINNING, containing 7.64 acres.

*PARCEL NO. 2:* That certain tract or parcel of land, situated on Upper Hensley Creek and Lower Hensley Creek and Lower Hensley Creek and the waters of Tug River, in McDowell County, West Virginia, more particularly bounded and described as follows, to-wit:

BEGINNING at a double hemlock on a spur about 300 feet west of Upper Hensley Creek and about 500 feet from Tug River; thence S. 30 deg. 20′ W. 230 feet to a point in a line of Alex Trent 150 acres; thence with same and crossing old line of Norfolk and Western Railway to a point on the north bank of Tug River; thence with said bank of same Westward to the center of Lower Hensley Branch; thence leaving Tug River and up said Lower Hensley Creek N. 45 deg. W. 80 feet; N. 35 deg. 50′ W. 755 feet; N. 20 deg. 05′ W. 305 feet; N. 60 deg. 50′ W. 350 feet; N. 9 deg. 25′ E. 105 feet; N. 34 deg. 05′ W. 305 feet; N. 25 deg. 42′ W. 299 feet; N. 61 deg. 00′ W. 347 feet; N. 66 deg. 12′ W. 202 feet; N. 42 deg. 10′ W. 421 feet; N. 81 deg. 00′ W. 376 feet; N. 37 deg. 00′ W. 428 feet; N. 58 deg. 05′ W. 253 feet to a point in the creek at the fork; thence up the right Fork N. 44 deg. 45′ W. 363 feet; N. 0 deg. 10′ W. 218 feet; N. 25 deg. 15′ E. 154 feet; N. 13 deg. 20′ E. 163 feet; N. 33 deg. 54′ E. 38.5 feet; N. 58 deg. 30′ E. 181 feet; N. 1 deg. 50′ W. 195 feet; N. 26 deg. 20′ E. 162 feet; N. 6 deg. 45′ W. 301 feet; N. 9 deg. 30′ W. 231 feet; N. 24 deg. 12′ W. 161 feet; N. 22 deg. 45′ W. 154 feet; N. 56 deg. 25′ W. 160 feet to a point in the branch at a fork; thence up the right hand fork N. 48 deg. 30′ E. 710 feet; N. 34 deg. 00′ E. 179 feet; N. 2 deg. 25′ E. 247 feet; N. 27 deg. 25′ E. 357 feet; N. 45 deg. 35′ E. 150 feet to a point on the back line of the McCormick survey; thence with the said line S. 66 deg. 10′ E. 4300 feet to a point on the side line of the Hensley Land Company; thence with the side lines of said Hensley Land Company S. 11 deg. 53′ E. 1440 feet to a dogwood and white oak; thence S. 8 deg. 10′ W. 780 feet to a point 20 feet below the outcrop of the Davy seam of coal; thence around the hill with a line parallel to and 20 feet below the said outcrop, S. 34 deg. 28′ W. 100 feet; S. 32 deg. 50′ W. 135 feet; S. 19 deg. 50 W. 277 feet; S. 10 deg. 52′ W. 259 feet; S. 42 deg. 52′ W. 120 feet; S. 52 deg. 33′ W. 113 feet; S. 20 deg. 50′ W. 370 feet; S. 22 deg. 43′ W. 153 feet; S. 16 deg. 00′ W. 149 feet; S.

23 deg. 17' W. 65 feet; S. 66 deg. 07' W. 58 feet; S. 73 deg. 00' W. 25 feet to the point of BEGINNING, containing an area of 455 acres, more or less.

*PARCEL NO. 3:* That certain tract or parcel of land, lying on the waters of Tug River and est of Lower Hensley Creek, in McDowell County, West Virginia, more particularly bounded and described as follows, to-wit:

BEGINNING on an iron rail by a sycamore on the outcrop of the Sewell seam of coal in the first left hand hollow of Lower Hensley, a corner of Hampton Roads Collieries Company, and with one line of same S. 48 deg. 40' W. 6380 feet to an iron rail in the right of way on the old line of the Norfolk and Western Railroad; thence with said right of way in a westerly direction for a distance of about 740 feet to a stake; thence leaving said right of way, up the center of a drain, N. 1 deg. 11' W. 336 feet; N. 32 deg. 47' W. 487 feet; N. 26 deg. 50' W. 216 feet; N. 19 deg. 14' W. 303 feet; N. 6 deg. 00' W. 216 feet; N. 33 deg. 15' W. 257 feet to a stake by two hickories near the head of a drain; thence N. 27 deg. 00' E. 6072 feet to a stake in the center of Lower Hensley Creek; thence down said Lower Hensley Creek S. 70 deg. 00' e. 1225 feet to a stake in the forks of said Creek; thence continuing down said creek S. 58 deg. 05' E. 253 feet; S. 37 deg. 00' E. 428 feet; S. 81 deg. 00' E. 376 feet; S. 42 deg. 10' E. 421 feet; S. 66 deg. 12' E. 202 feet; S. 61 deg. 0' E. 347 feet; S. 25 deg. 42' E. 299 feet; S. 34 deg. 05' E. 355 feet; S. 9 deg. 25' W. 109 feet; S. 60 deg. 05' E. 350 feet; S. 20 deg. 05' E. 305 feet; S. 35 deg. 50' E. 755 feet to a point in old line of Norfolk and Western Railroad right of way; thence with said right of way in a southern direction for a distance of 730 feet to a point on said right of way, a corner of Hampton Roads Collieries Company; thence straight up the hill, and with several lines of said Hampton Roads Collieries Company, S. 80 deg. 39' W. 135 feet to a stake on the outcrop of the Sewell seam of coal; thence N. 9 deg. 20' W. 71 feet; N. 10 deg. 27' W. 37 feet; n. 25 deg. 26' W. 77 feet; N. 7 deg. 35' E. 97 feet; N. 20 deg. 53' W. 51 feet; N. 13 deg. 28' E. 117 feet; N. 8 deg. 48' E. 38 feet; N. 12 deg. 53' E. 96 feet; N. 49 deg. 53' W. 225 feet; N. 81 deg. 57' W. 70 feet; S. 87 deg. 38' W. 144 feet; N. 77 deg. 10' W. 140 feet to the BEGINNING, containing 547.7 acres, more or less; and being a part of the tract of land known as the Warren–Simpson Tract.

Being the same tracts or parcels of land which were conveyed by Famous Pocahontas Coal Company, a corporation, to Roderfield Realty Company, a corporation, by deed dated January 1, 1945, and recorded in the office of the Clerk of the County Court of McDowell County, West Virginia, in Deed Book No. 162, page 459; and being also a portion of the property conveyed to the party of the first part hereto by Roderfield Realty Company, a corporation, by deed dated May 16, 1958, and recorded in said Clerk's office in Deed Book No. 237, page 518, reference to both of which deeds is hereby made.

2. There is excepted and reserved from the operation of this deed:

(a) All the oil and gas and all the coal in the Pocahontas No. 3 and No. 4 seams in said three tracts of land above described.

(b) All the timber situate on the tract of land herein described in Paragraph 1 as "PARCEL NO. 2", situate on the watershed of Upper Hensley Branch, sold by R.L. Page and wife to the J.B.B. Coal Company.

(c) All rights of way heretofore acquired by the Norfolk and Western Railway Company in or on any of the tracts above described.

(d) All rights of way heretofore acquired by the Appalachian Electric Power Company in or on any of the tracts above described.

(e) All rights of way heretofore acquired by the Chesapeake and Potomac Telephone Company in or on any of the tracts above described.

(f) The surface of that certain tract or parcel of land, containing 50 acres, more or

less, out of the 547.7 acre tract herein-before described in Paragraph 1 as "PAR-CEL NO. 3", heretofore conveyed by Famous Pocahontas Coal Company, predecessor in title of the party of the first part, to Mrs. Cora Lee Smith, by deed dated April 15, 1940, and of record in said Clerk's office in Deed Book No. 159, page 288, to which deed reference is here made for a description of the surface land in this paragraph excepted.

(g) All that certain tract or parcel of land, containing 7.6 acres, more or less, out of the 547.7 acre tract hereinbefore described in Paragraph 1 as "PARCEL NO. 3", heretofore conveyed by Famous Pocahontas Coal Company, predecessor in title of the party of the first part, to S.M. Burgess, by deed dated December 2, 1938, and of record in said Clerk's office in Deed Book No. 141, page 103, to which deed reference is here made for a description of the tract of land in this paragraph excepted and reserved.

(h) The remaining surface in all of said tracts of land heretofore conveyed by Roderfield Realty Company, predecessor in title of the party of the first part, to J.A. Blevins, by deed dated October 29, 1945, and recorded in said Clerk's office in Deed Book No. 165, page 420, reference to which deed is hereby made for a description of the surface land in this paragraph excepted and reserved.

3. This deed is made subject to the following described instruments:

(1) Agreement between Roderfield Realty Company, predecessor in title of the party of the first part, and United Fuel Gas Company, dated October 8, 1956, and recorded in said Clerk's office in Deed Book No. 227, page 412.

(2) Agreement between Famous Pocahontas Coal Company, predecessor in title of the party of the first part, and Hope Natural Gas Company, dated December 17, 1942, and recorded in said Clerk's office in Deed Book No. 156, page 133.

(3) All leases of the surface of the real estate hereinbefore described, which are now in existence, whether or [sic] record in said Clerk's office or not.

4. As a part of the consideration aforesaid, the party of the first part does hereby give and grant to the party of the second part the right and privilege of using, in common with the party of the first part, a strip of land thirty (30) feet in width up said Hensley Creek, as a right of way to the lands lying in the rear of the tract or parcel of land conveyed by Famous Pocahontas Coal Company to S.M. Burgess, by deed dated December 2, 1938, and recorded in said Clerk's office in Deed Book No. 141, page 103, to which deed reference is here made for a metes and bounds description of the tract of land through which said right of way extends.

5. As a part of the consideration aforesaid, the party of the first part does hereby give and grant to the party of the second part, to be used and enjoyed by him in common with the party of the first part, all the mining rights and privileges in connection with or appurtenant to said coal and minerals hereby granted, which the party of the first part has or is entitled to, incident to the ownership of the coal and minerals hereby conveyed, and specifically, but not by way of limitation or exclusion:

a. All and singular the mining rights and privileges excepted and reserved to Roderfield Realty Company, predecessor in title of the party of the first part, in that certain deed dated October 29, 1945, from Roderfield Realty Company to J.A. Blevins, of record in said Clerk's office in Deed Book No. 165, page 420, to which deed reference is here made for a description of said mining rights and privileges, and which said mining rights and privileges are now held and owned by the party of the first part.

b. All and singular the mining rights and privileges excepted and reserved to Famous Pocahontas Coal Company, predecessor in title of the party of the first part, in that certain deed dated April 15, 1940, from Famous Pocahontas Coal Company to Mrs. Cora Lee Smith, recorded in said Clerk's office in Deed Book No. 159, page 288, to which deed reference is hereby

made for a description of said mining rights and privileges, and which said mining rights and privileges are now held and owned by the party of the first part.

6. It is understood and agreed that there is excepted and reserved to the party of the first part, its successors, assigns and lessees, the right to mine and remove all of said No. 3 and No. 4 Pocahontas seams of coal, together with the right to bore for and remove all the oil and gas underlying said tracts, such rights, however, to be used in common with the party of the second part and so as to interfere as little as possible with the mining operations of the party of the second part.

7. It is further understood and agreed that, should the party of the first part be desirous of selling the coal in said No. 3 and No. 4 Pocahontas seams in, on or underlying said tracts of land, it shall first offer said seams of coal to the party of the second part for the time being at a price to be named by the party of the first part; and if the party of the second part shall not, within sixty (60) days, accept such offer, then the party of the first part shall be at liberty to sell said seams of coal to any other person, firm or corporation at the same or higher price, but shall not sell said seams to any other person, firm or corporation at a lower price, unless and until it shall have been offered to the party of the second part for the time being at such less price and such last-mentioned offer shall not have been accepted by the party of the second part within said sixty (60) day period.

8. It is further understood and agreed that the phrases "party of the first part" and "party of the second part" shall include not only the parties hereto, but their respective successors, heirs, legal representatives and assigns.

9. TO HAVE AND TO HOLD said coal and other minerals and mineral substances and said mining rights and privileges, together with the appurtenances thereunto belonging or in any wise appertaining, but subject to the exceptions, reservations, stipulations and agreements hereinbefore set forth, unto the party of the second part, his heirs and assigns, forever.

IN TESTIMONY WHEREOF, the said Tug Fork Land Company has caused these presents to be signed in its corporate name by its President, and has caused its corporate seal to be hereunto affixed; all as of the day, month and year first above written.

TUG FORK LAND COMPANY,

BY Henry C. Barley
President

### APPENDIX B

#### *STUPID*

| CASE | PUNITIVE | COMPENSATORY | RATIO |
|---|---|---|---|
| *Mason v. Texaco, Inc.*, 948 F.2d 1546 (10th Cir.1991) | $12,500,000 | $9,025,000 | 1.4:1 |
| *Defender Industries, Inc. v. Northwestern Mut. Life Ins. Co.*, 938 F.2d 502 (4th Cir. 1991) | $5,000,000 | $106,514 | 46.9:1 |
| *A. Doe, et al. v. B.P.S. Guard Services, Inc.*, 945 F.2d 1422 (8th Cir.1991) | $35,000 | $1,000 | 35:1 |
| *Hospital Authority of Gwinnett County v. Jones*, 409 S.E.2d 501 (Ga.1991) *cert. denied* — U.S. —, 112 S.Ct. 1175, 117 L.Ed.2d 420 | $1,300,000 | $5,001 | 260:1 |
| *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991) | $87,500 | $2,500 | 35:1 |

| CASE | PUNITIVE | COMPENSATORY | RATIO |
|---|---|---|---|
| *Liberty Transport, Inc., v. Harry W. Gorst Co., Inc.,* 229 Cal.App.3d 417, 280 Cal.Rptr. 159 (Ca.App. 2 Dist.1991) | $400,000 | $82,500 | 4.8:1 |
| *Jennings v. Jessen,* 103 N.C.App. 739, 407 S.E.2d 264 (1991) | $300,000 | vacated | ∞ |
| *Wolfe v. Goodyear Tire & Rubber Co.,* 808 S.W.2d 868 (Mo.App.1991) | $250,000 | $49,500 | 5.1:1 |
| *United Farm Bureau Mut. Ins. Co. v. Ira,* 577 N.E.2d 588 (Ind.App.1991) | $105,000 | $55,000 | 1.9:1 |
| *Muehlstedt v. City of Lino Lakes,* 473 N.W.2d 892 (Minn.App.1991) | $70,000 | $35,000 | 2:1 |

*MEAN*

| CASE | PUNITIVE | COMPENSATORY | RATIO |
|---|---|---|---|
| *Browning–Ferris v. Kelco Industries,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) | $6,000,000 | $51,000 | 117.6:1 |
| *Glasscock v. Armstrong Cork Co.,* 946 F.2d 1085 (5th Cir.1991) *rehearing denied* 951 F.2d 347, *cert. denied* — U.S. —, 112 S.Ct. 1778, 118 L.Ed.2d 435 | $6,100,000 | $317,625 | 19.2:1 |
| *Eichenseer v. Reserve Life Ins. Co.,* 934 F.2d 1377 (5th Cir.1991) | $500,000 | $1,000 | 500:1 |
| *Burke v. Deere & Co.,* 780 F.Supp. 1225 (S.D.Iowa 1991) | $28,000,000 | $390,000 | 71.8:1 |
| *Robertson Oil Co., Inc. v. Phillips Petroleum Co.,* 779 F.Supp. 994 (W.D.Ark.1991) | $8,000,000 | $750,000 | 10.7:1 |
| *General Motors Corp. v. Johnston,* 592 So.2d 1054 (Ala.1992) | $7,500,000 | $75,000 | 100:1 |

McHUGH, Chief Justice, concurring:

Although I concur with much of the majority's analysis in the present case, I disagree with the majority's categorization of defendants against whom punitive damages have been awarded. The majority opinion categorizes these defendants as either "really mean" or "really stupid." In its cavalier attempt to be clever and amusing, the majority opinion has carelessly ignored the fundamental factors which have traditionally been used by courts to characterize the conduct of defendants in assessing punitive damages.

Punitive damages have historically been part of our state tort law. As the law has developed in this area, certain terms have been established to characterize the degree of reprehensibility of the defendant's conduct.

Our traditional rule summarizing the type of conduct that will give rise to punitive damages is found in syllabus point 1 of *Goodwin v. Thomas,* 184 W.Va. 611, 403 S.E.2d 13 (1991):

'"In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes, it, the jury may assess exemplary, punitive, or vindictive damages...." Syllabus point 4, in part, *Mayer v. Frobe,* 40 W.Va. 246, 22 S.E. 58 (1895).' Syllabus point 1, *Wells v. Smith,* 171 W.Va. 97, 297 S.E.2d 872 (1982).

Not surprisingly, none of the courts in the punitive damages cases cited by the majority use the terms "really stupid" or "really mean" when describing the defendant's actions in their review of the punitive damage awards. Instead, when characterizing the defendant's conduct, those courts use terms such as "conscious indifference," *Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085, 1093 (5th Cir.1991), *reh'g denied*, 951 F.2d 347, *cert. denied*, *Celotex Corp. v. Glasscock*, —— U.S. ——, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992); "reckless, willful and wanton," *Defender Industries, Inc. v. Northwestern Mutual Life Ins. Co.*, 938 F.2d 502, 505 (4th Cir. 1991); "particularly egregious," *Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377, 1382 (5th Cir.1991); and "reprehensible," *Hospital Authority of Gwinnett County v. Jones*, 261 Ga. 613, 409 S.E.2d 501, 502 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992) and *Gamble v. Stevenson*, 406 S.E.2d 350, 355 (S.C.1991).

These terms are well-founded in our tort law, and I can see no useful purpose whatsoever in abandoning these terms for the ridiculous categorization proposed by the majority in its opinion today. The terms noted above are those upon which attorneys and judges have traditionally relied in assessing punitive damages awards. Unfortunately, by suggesting the use of such subjective and nontechnical terms as "really stupid" and "really mean," the majority has offered no practical guidance to attorneys or judges in analyzing punitive damages cases.

I am authorized to state that Justice MILLER joins me in this concurring opinion.