**IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA**

Spring 2025 Term

_____

No. 24-ICA-154

_____

**FILED**

**May 22, 2025**

released at 3:00 p.m.
ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

CARBON ENERGY CORPORATION, CARBON WEST VIRGINIA COMPANY, LLC, n/k/a DP BLUEGRASS, LLC, and DIVERSIFIED GAS AND OIL CORPORATION,
Defendants Below, Petitioners

v.

SHONK LAND COMPANY, LLC,
Plaintiff Below, Respondent

_____

Appeal from the Circuit Court of Kanawha County

Honorable Jennifer F. Bailey, Judge

Civil Action No. 20-C-613

AFFIRMED, IN PART, AND REVERSED, IN PART

_____

Submitted: March 4, 2025

Filed: May 22, 2025

Ancil G. Ramey, Esq.
Steptoe & Johnson PLLC
Huntington, West Virginia
Counsel for Petitioners DP Bluegrass, LLC
and Diversified Gas and Oil Corporation

Timothy M. Miller, Esq.
Robert M. Stonestreet, Esq.
Babst Calland Clements & Zomnir, PC
Charleston, West Virginia
Counsel for Petitioners DP Bluegrass, LLC
and Diversified Gas and Oil Corporation

Nicholas S. Johnson, Esq.
Joshua I. Hammack, Esq.
Bailey & Glasser LLP
Washington, District of Columbia
Counsel for Respondent

Sallie Gilbert, Esq.
Bailey & Glasser LLP
Charleston, West Virginia
Counsel for Respondent

Michael Meadows, Esq.
Burns White, LLC
Huntington, West Virginia
Counsel for Petitioner Carbon Energy

JUDGE DANIEL W. GREEAR delivered the Opinion of the Court.

GREEAR, Judge:

Carbon Energy Corporation ("CEC"), Carbon West Virginia Company, LLC ("Carbon"), n/k/a DP Bluegrass, LLC ("DP Bluegrass"), and Diversified Gas and Oil Corporation ("Diversified") (collectively "Petitioners") appeal two orders from the Circuit Court of Kanawha County, an October 6, 2023, Judgment Order and a March 21, 2024, Order Resolving Defendants' Post-Trial Motions. With respect to these orders, Petitioners argue that the circuit court erred in failing to enter judgment as a matter of law in Petitioners' favor as to Respondent Shonk Land Co.'s ("Shonk") claims for breach of contract, breach of good faith and fair dealing, willful trespass, unjust enrichment, slander of title (and associated attorney's fees), and tortious interference. Further, Petitioners argue that the circuit court erred in denying Petitioners' motion for a new trial.

Based on our review of this matter, we find no error in the circuit court's denial of Petitioners' post-trial motions regarding Shonk's breach of contract and willful trespass claims, as the record contains no legal or factual basis to disturb the jury's decision. However, we find that the circuit court erred in denying Petitioners' post-trial motions for judgment as a matter of law on Shonk's unjust enrichment, tortious interference, and slander of title claims. As to the circuit court's denial of Petitioners' motion for a new trial, we find no error. Accordingly, we affirm, in part, and reverse, in part, the circuit court's October 6, 2023, Judgment Order and the March 21, 2024, Order Resolving Defendants' Post-Trial Motions.

1

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Shonk is a land company, a long-standing organization of about a hundred or so family members formed to hold and manage the Shonk family's land. This case concerns two leases to produce oil and gas from Shonk land. First, on May 20, 1930, Shonk executed an oil and gas lease agreement with the Larner Gas Company ("Larner"), covering approximately 16,000 acres of property situated in Kanawha and Boone Counties (the "Larner Lease"). Through a series of transactions over the years, the Larner Lease came to be controlled by the Cabot Oil & Gas Corporation ("Cabot"). The second oil-and-gas lease dates to 1914 and involved the Williams Corporation of Kanawha; the parties refer to that lease as the "Williams Lease." On October 1, 1986, Union Oil Company of California ("Union Oil") executed an agreement assuming control of the Williams Lease, which at that time encompassed approximately 11,000 acres of property situated in Kanawha County. In 1993, Cabot purchased Union Oil's interest in the Williams Lease.

In 2015, Shonk and Cabot executed documents that consolidated the Williams and Larner Leases (collectively the "Leases") under one agreement (the "First Lease Amendment"). Then, in 2017, Cabot informed Shonk that it intended to convey its interests under the First Lease Amendment to Carbon. Shonk objected to Cabot's proposed transfer to Carbon. On or about September 29, 2017, over Shonk's objection, Cabot conveyed all of its interest under the Leases to Carbon.

On May 6, 2019, Shonk, Carbon, and Carbon's parent company, CEC, entered into a Second Lease Amendment and Ratification (the "Second Lease Amendment") for the Leases.[1] The Second Lease Amendment governed approximately 57 natural gas wells and associated infrastructure operated by Carbon. The Second Lease Amendment contained a Right of First Refusal ("ROFR") that required Carbon to provide Shonk the first right to purchase Carbon's interest in the Leases in the event of a proposed sale to a third party. This ROFR gave Shonk the right to purchase the lease interests from Carbon for the same "value" that Carbon or CEC expected to receive from the sale. If Carbon or CEC breached any part of the ROFR, then the lease interests would automatically be forfeited to Shonk.[2]

---

[1] The Second Lease Amendment was executed as a part of a confidential settlement associated with the disputed assignment from Cabot. CEC had a Guaranty Agreement with Shonk securing Carbon's performance.

[2] Specifically, the ROFR provision states, in pertinent part and with emphasis added:

> **Right of First Refusal.** In the event that Lessee seeks to Transfer (as defined herein) all or any portion of its interest in any well under the Lease or all or any portion of its interest under the Lease (the "Transferred Interest"), Lessee shall promptly provide written notice (the "Notice of Intent to Transfer") to Lessor and include information concerning the purported transferee of the Transferred Interest and the value Lessee expects to receive in exchange for transferring the Transferred Interest. Lessor shall keep all information provided by Lessee pursuant to this provision confidential and shall not disclose such information to any person or use such information for any purpose other than as contemplated by this paragraph 1.a. without Lessee's prior written consent. At any time within thirty (30) days after actual receipt (notwithstanding any application of the "mailbox rule") of the Notice of Intent to Transfer, Lessor may elect to purchase the Transferred Interest for the value

3

and upon the terms set out in the Notice of Intent to Transfer and shall give written notice of such election to Lessee. If Lessor fails to give such written notice of election to purchase within thirty (30) days of receipt of the Notice of Intent to Transfer or earlier provides Lessee with written notice that it declines to exercise its Right of First Refusal, Lessee shall have the right to proceed with the Transfer of the Transferred Interest in accordance with the Notice of Intent to Transfer. Lessor's waiver of its Right of First Refusal for any specific Transfer shall be effective only for that specific Transfer and shall not constitute a waiver of its Right of First Refusal to purchase Lessee's interest upon any future Transfer. "Transfer" as used in this Section 9 means any sale, assignment, merger, mortgage, sale of all or a controlling equity interest in Carbon West Virginia Company, LLC or any successor entity, including any of the above undertaken by operation of law (including by bankruptcy); provided, however, that a Transfer to a wholly-owned affiliate or subsidiary of Carbon Energy Corporation shall not be a "Transfer" under the terms of this Second Lease Amendment and Ratification. *In the event that Lessee breaches any material aspect of Lessor's Right of First Refusal, the Parties specifically agree that the Lease shall be forfeited and forever cease and terminate without further notice by Lessor as of the date of such breach, regardless of any argument under law or equity against such forfeiture.* Upon a material breach of Lessor's Right of First Refusal, Lessor shall have the right to enter upon, use and take possession of the leased premises and all machinery and equipment thereon which is necessary for the continued production of gas on the leased premises (this specifically excludes vehicles and other mobile equipment and machinery), and hold and possess the same free and acquit from any claims of Carbon West Virginia Company, LLC thereto in like manner as if this Lease had not been made. No forfeiture, reentry, or termination by Lessor shall in any way impair Lessor's ability or right to collect royalties or any other payment then owing under the terms of the Lease. The Parties, aware of this specific remedy and its potential effect, nonetheless specifically agree to impose it in the Lease as a consequence for breach of the foregoing Right of First Refusal provision.

[…]

A "material breach" as used herein is defined as a breach of contract that deprives the other party of a substantial benefit

4

On April 7, 2020, CEC agreed to sell its ownership interests in the Leases to Diversified. The sale contract was a membership interest purchase and sale agreement, referred to by the parties as the "MIPA." This sale to Diversified was part of a larger transaction in which Diversified intended to purchase 100% of CEC's interests in several affiliated companies, including Carbon, for a base purchase price of $110 million.[3] As required by the ROFR, on April 8, 2020, Carbon provided Shonk with a Notice of Intent to Transfer their interests in the Leases. In the notice, Carbon represented that CEC and Diversified allocated $2,605,707 toward the purchase price of the Leases and offered to sell the interests to Shonk for this amount. On April 14, 2020, Shonk sent Carbon a written request for valuation information necessary to evaluate the fairness and accuracy of the purchase price. Following this request, CEC sent Shonk an "allocated value table" for the wells governed by the Leases. On April 21, 2020, Shonk was advised by Carbon that the schedules and exhibits to the sales agreement between CEC and Diversified would not be provided to Shonk, as this information was designated by Diversified as confidential. On May 5, 2020, Shonk sent Carbon a notice that it elected to exercise its ROFR under both Leases.

---

that the other part reasonably expected to receive under the terms of the contract.

[3] This transaction involved approximately 7,800 wells; of those, only 57 wells were covered under the Leases.

On May 14, 2020, Carbon provided draft conveyance documents to Shonk to accomplish the transfer pursuant to the ROFR. Simultaneously, CEC continued working with Diversified on the larger transaction. On May 26, 2020, CEC and Diversified closed their transaction. In connection with that transaction, CEC executed an open-ended mortgage, credit line deed of trust, assignment of as-extracted collateral, security agreement, fixture filing and financial statement that mistakenly included the Leases. After realizing the mistake, a release was later recorded to correct the error.

Because CEC transferred all its (and Carbon's) interests in the leases to Diversified before Shonk could complete the exercise of its rights under the ROFR, on May 29, 2020, Shonk declared a default under the Second Lease Amendment and forfeiture of the Leases. However, Shonk stated it would withhold its claimed right of forfeiture in an effort to explore a transaction with Diversified. Shonk gave Carbon and CEC thirty (30) days to cure the breaches of the ROFR under the Leases. Despite receiving the default and forfeiture notice, Carbon remained on Shonk's property and continued operating the subject wells.

By letter dated June 10, 2020, Shonk and Diversified documented their agreement to work together toward closing the lease transaction while reserving their claims and/or defenses. Shonk made numerous requests for information on how Carbon, CEC, and Diversified valued the Lease interests in comparison to the other wells involved

6

in the CEC-Diversified transaction. Diversified never provided Shonk the requested information. Based on its own evaluation, Shonk developed significant concerns regarding the fairness of the ROFR purchase price.

On June 23, 2020, Carbon recorded the conveyance to Diversified and the mortgage on Shonk's interest. Problematically, Carbon and Diversified mistakenly recorded the "open end wellbore mortgage" or "credit line deed of trust" secured, in part, by the Shonk Lease interests. On July 10, 2020, Shonk notified Diversified that it was dissatisfied with the information provided about CEC and Diversified's claimed valuations, and it said that further disclosure was immediately required. Shonk also sent Carbon another notice of its intent to exercise its ROFR. Finally, on July 23, 2020, Shonk filed this civil action against CEC and Carbon alleging breaches of contract and a breach of CEC's guaranty.

On December 21, 2020, Shonk received a letter from Diversified indicating that Diversified had acquired an interest in certain gas-producing wells under the Leases. The letter also set out the royalty payment schedule to be paid to Shonk, despite the Leases containing an entirely different royalty schedule. By letter dated February 3, 2021, Shonk notified Diversified that the transfer of Lease interests violated the terms of the ROFR. Shonk informed Diversified that it was pursuing its rights under the Leases and ROFR, including the forfeiture of the Leases to Shonk. Shonk also pointed out that Diversified's

royalty payment cycle also violated the terms of the Leases, which required royalty payments on or before the 25th day of each month for all production from the month immediately preceding. Shonk noted that royalty payments from Diversified were not being received timely. Lastly, Shonk alleged that Diversified was trespassing.

On July 19, 2021, the circuit court granted Shonk's motion for leave to file its first amended complaint, which added Diversified to the civil action. The first amended complaint alleged the following:

- Count I: Breach of the Leases based upon the transfer of Lease interests to Diversified in violation of the terms of the Leases regarding Shonk's right of first refusal;

- Count II: Breach of the Leases based upon the failure of CEC and Carbon to provide Shonk with sufficient information regarding the value of the Leases;

- Count III: Breach of the Leases based upon the failure of CEC and Carbon to act in good faith and fair dealing;

- Count IV: Breach of the Guaranty by CEC;

- Count V: Breach of the Leases based upon Carbon and CEC mortgaging Shonk's interest under the right of first refusal;

- Count VI: Breach of the Leases by Carbon based upon its assignment of its interest under the Leases to Diversified;

- Count VII: Breach of the Leases by CEC and Carbon based upon the failure to tender royalties and furnish royalty statements;

- Count VIII: Slander of Title by Carbon for recording the assignment to Diversified;

- Count IX: Trespass by Carbon following receipt of the May 29, 2020, notice of default;

- Count X: Unjust Enrichment by Carbon following May 29, 2020, notice of default; and

- Count XI: Tortious Interference with Contract by Diversified for tortiously interfering with Shonk's right of first refusal.

Additionally, the first amended complaint requested declaratory judgment proclaiming that the Leases were forfeited to Shonk as a result of a material breach of the ROFR clause, and Shonk sought compensatory damages and attorneys' fees.

A jury trial in the underlying case began on May 2, 2022. During the trial, the three Petitioners moved for judgment as a matter of law following Shonk's case in chief and renewed the motion following the close of its case in chief. The motion was denied each time. On May 6, 2022, the jury returned a verdict in favor of Shonk on the issues of liability and damages. Ultimately, the jury determined that Carbon and CEC materially breached the Leases by closing the deal with Diversified, in violation of Shonk's ROFR, and in failing to provide the requested valuation information to Shonk (including the schedules and exhibits to the aforementioned CEC-Diversified sales agreement or "MIPA"). Additionally, the jury found that CEC breached its agreement to guaranty Carbon's performance of the Leases' terms. The jury also found that Carbon slandered Shonk's title by recording an assignment on June 23, 2020, which purportedly conveyed

9

the Leases' interests to Diversified. Further, the jury determined that Carbon committed willful trespass against Shonk by continuing well operations on the leased land after receiving notice of the lease forfeiture and, accordingly, that Carbon was unjustly enriched. As for Diversified, the jury found that it had tortiously interfered with Shonk's ROFR under the Leases. Based on these findings, the jury awarded Shonk the following: (1) $1,280,504 on its tortious interference claim, (2) $1,596,847 on its trespass claim, and (3) $1,302,803 on its unjust enrichment claim. Pursuant to the ROFR, Shonk was awarded the property that was subject to the Leases pursuant to the contracted forfeiture. The jury did not award punitive damages.

Thereafter, the parties filed competing motions for entry of judgment. On September 28, 2022, the circuit court held a hearing regarding the parties' motions. On October 6, 2023, the circuit court entered its judgment order, memorializing the jury's verdict and ruling on the parties' motions for entry of judgment. The order determined that a post-trial *Pitrolo*[4] hearing was necessary for attorney's fees and noted that the same would

---

[4] In Syllabus Point 4 of *Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W. Va. 190, 342 S.E.2d 156 (1986), the Supreme Court of Appeals of West Virginia ("SCAWV"), held

> Where attorney's fees are sought. . . , the test of what should be considered a reasonable fee is determined not solely by the fee arrangement between the attorney and his client. The reasonableness of attorney's fees is generally based on broader factors such as: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent;

be held within sixty days. Next, the circuit court determined that Shonk was entitled to prejudgment interest on their willful trespass, tortious interference, and unjust enrichment claims pursuant to West Virginia Code § 56-6-31 (2018), at a rate of 4.75% per annum, from May 26, 2020, the date the cause of action accrued, through October 12, 2022, the date upon which the circuit court sought to have its judgment entered. Further, the court awarded post-judgment interest, pursuant to West Virginia Code § 56-6-31(a) and (c), on the amounts awarded, from the date the judgment order was entered at a rate of 4.00% annum, until paid in full.[5]

---

(7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

[5] The circuit court's judgment order specifically stated:

1. The Larner and Williams Leases are terminated and forfeited as of May 26, 2020, as a result of each material breach of the Leases and the material breach of the guaranty. Shonk has the right to enter upon, use and take possession of the leased premises and all machinery and equipment thereon which is necessary for the continued production of gas on the leased premises (this specifically excludes vehicles and other mobile equipment and machinery), and hold and possess the same free and clear from any claims of Defendants;

2. Defendant Diversified Gas and Oil Corporation is ORDERED to pay Plaintiff Shonk Land Company LLC $1,280,504 for tortious interference damages, together with prejudgment interest in the amount of $144,810.97, through October 12, 2022, for a total of $1,425,314.97;

11

Following the entry of the judgment order, Petitioners filed a Rule 50(b)

motion requesting that the circuit court set aside the jury's verdict and grant Petitioners

judgment as a matter of law. As alternative relief, Petitioners filed a Rule 59(a) motion

---

3.     Defendant Carbon West Virginia Company is hereby adjudged to have slandered Plaintiff's title, and Plaintiff is hereby ORDERED to submit a petition for attorneys' fees consistent with *Aetna Cas. Sur. Co. v. Pitrolo,* 176 W. Va. 190 (1986), no later than sixty (60) days following the entry of this Judgment Order; provided however, that should Defendants file any timely post-judgment motions and/or notice of appeal regarding this Judgment Order, then Plaintiff's deadline to file such a petition is tolled until further order of this Court following resolution of any post judgment motions and/or appeals;

4.     Defendant Carbon West Virginia Company is ORDERED to pay Plaintiff Shonk Land Company $1,596,847 for willful trespass damages, together with pre-judgment interest in the amount of $180,585.90, through October 12, 2022, for a total of $1,777,432.90;

5.     Defendant Carbon West Virginia Company is ORDERED to pay Plaintiff Shonk Land Company $1,302,803 for unjust enrichment damages, together with prejudgment interested in the amount of $147,332.74, through October 12, 2022, for a total of $1,450,135.74;

6.     It is furthered ORDERED that post-judgment interest shall accrue on all amounts set forth in this Judgment Order at the statutory rate of 4.00% per annum from the date of entry of this Judgment Order, until paid in full; and

7.     It is further ORDERED that Costs are taxed against Defendants, divided equally among them. The clerk shall prepare a bill of costs consistent with the West Virginia Rules of Civil Procedure.

seeking a new trial and argued that the evidence did not support the jury's verdict and award of damages. Further, Petitioners argued that they were entitled to a new trial due to the alleged improper statements made by Shonk's counsel in Shonk's opening statement and closing arguments to the jury. On March 21, 2024, the circuit court entered an order denying both motions. This appeal followed.

## II.    STANDARD OF REVIEW

Below, Petitioners filed a motion for judgment as a matter of law pursuant to West Virginia Rule of Civil Procedure 50(b). The appellate standard of review for a circuit court's ruling on a renewed motion for judgment as a matter of law made pursuant to Rule 50(b) of the West Virginia Rules of Civil Procedure is de novo. Syl. Pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009). As we review the circuit court's order denying the renewed motion for judgment as a matter of law after trial under Rule 50(b):

> [i]t is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.

*Lunsford v. Shy*, 243 W. Va. 175, 181, 842 S.E.2d 728, 734 (2020) (quoting *Fredeking*, 224 W. Va. 1, 680 S.E.2d 16, syl. pt. 2).

As to Petitioners' motion seeking a new trial, pursuant to West Virginia Rule of Civil Procedure 59(a), we review the rulings of the circuit court concerning a new trial

13

and its conclusion as to the existence of reversible error under an abuse of discretion standard, and the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review. *Lunsford*, 243 W. Va. at 181, 842 S.E.2d at 734. Moreover, the SCAWV has noted that "a trial judge should rarely grant a new trial. ... Indeed, a new trial should not be granted unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *Id.* (quoting *McInarnay v. Hall*, 241 W. Va. 93, 98, 818 S.E.2d 919, 924 (2018) (internal quotations and citation omitted)). With these standards in mind, we now turn to the Petitioners' assignments of error.

## III.    DISCUSSION

Petitioners raise five assignments of error on appeal.[6] First, Petitioners argue that the circuit court erred by failing to enter judgment in their favor on Shonk's breach of contract and implied covenant claims, and that there was no evidence from which a jury could reasonably find a material breach of the ROFR. Second, Petitioners assert that the circuit court erred by failing to enter judgment in Petitioners' favor on Shonk's willful trespass claim, as, in the absence of a forfeiture, Petitioners had the right to operate the wells; but, even with a forfeiture, Shonk decided not to take over operations of the wells while the parties negotiated sales terms. Third, Petitioners contend that the circuit court

---

[6] We have combined Petitioners' assignments of error that are duplicative and will address some of these assignments out of order to group like claims together for efficient disposition. *See generally Tudor's Biscuit World of Am. v. Critchley*, 229 W. Va. 396, 402, 729 S.E.2d 231, 237 (2012) (per curiam) (consolidating assignments of error).

erred by failing to enter judgment in their favor on Shonk's tortious interference claim, as the claimed damages were unsupported and duplicative of damages awarded in other counts. As to the remaining two assignments of error, Petitioners allege that the circuit court erred by failing to enter judgment in their favor on Shonk's slander of title claims, as the document accidentally recorded made no reference to Shonk's leases and no evidence was presented to the jury to suggest that any third party saw the document and inferred any negative imputation on Shonk's title, and there was no evidence of the special damages required in a slander-of-title claim. Along this same vein, Petitioners aver that the circuit court erred by permitting Shonk's post-trial pursuit of slander of title and the resultant special damages, an award of attorney's fees. We begin our analysis with Petitioners' breach of contract and implied covenant claims.

### A. Breach of Contract and Implied Covenant Claims

Petitioners argue that the circuit court erred in failing to enter judgment in Petitioners' favor on Shonk's breach of contract and implied covenant claims as no evidence was introduced at trial to support Shonk's allegation that a material breach occurred. A material breach is expressly defined within the Second Lease Amendment as one that "deprives the other party of a substantial benefit that the other party reasonably expected to receive under the terms of the contract." Petitioners maintain that Carbon's obligation to honor Shonk's ROFR was wholly unaffected by closing the Diversified transaction and that a change in ownership of Carbon had no detrimental impact on Shonk, who was free to continue its ROFR purchase with Diversified. Further, Petitioners claim

that Shonk continued its negotiations of that ROFR purchase with Diversified post-acquisition, and it was Shonk that walked away from the transfer of the Leases, not Diversified. We disagree.

To establish a breach of contract claim, three elements must be presented. "A claim for breach of contract requires proof of the formation of a contract, a breach of the terms of that contract, and resulting damages." *Sneberger v. Morrison*, 235 W. Va. 654, 669, 776 S.E.2d 156, 171 (2015). It is undisputed in the record on appeal that CEC and Carbon were engaged in a contractual relationship with Shonk pursuant to the Second Lease Amendment and Guaranty Agreement. Under the Second Lease Amendment, "upon the purported transfer involving any interest ("Transferred Interest")" under the Leases, Carbon was required to provide "written notice (the "Notice of Intent to Transfer") to Lessor [Shonk] and include information concerning the purported transferee of the Transferred Interest and the value Lessee expects to receive in exchange for transferring the Transferred Interest." Within thirty (30) days of such Notice of Intent to Transfer, the "Lessor [Shonk] may elect to purchase the Transferred Interest for the value and upon the terms set out in the Notice of Intent to Transfer and shall give written notice of such election to Lessee [Carbon]."

On April 8, 2020, Carbon sent Shonk their Notices of Intent to Transfer. The notices disclosed the existence of a larger transaction between CEC and Diversified and indicated an offer for the Transferred Interest under the Leases. Carbon stated that the

16

allocated valuations in the CEC-Diversified sale were $60,022 for the interest associated with the Williams Lease, and $2,605,707 for the interest associated with the Larner Lease. In response to the notices, Shonk requested detailed information concerning the value Carbon (and CEC) actually expected to receive from Diversified in exchange for the Transferred Interest. Shonk argued the ROFR required disclosure of this information in order for them to evaluate the fairness of the value allocated to the Leases and become fully cognizant of the terms and conditions associated with this purchase. In support of such argument, Shonk noted that the ROFR in the Second Lease Amendment contained a confidentiality provision and, when the ROFR was signed, the parties contemplated the disclosure of confidential information. Nonetheless, in response to Shonk's request, Carbon and Diversified jointly declared the information regarding their valuation of the Lease interests was "confidential" and refused to disclose the information to Shonk.

On May 5, 2020, within the thirty (30) days required by the ROFR, Shonk elected to exercise its right to purchase of the Transferred Interests "on and subject to the same terms and conditions set forth in the agreement" between CEC and Diversifed. Shonk provided notice of this election in writing, as required by the Second Lease Amendment, and Carbon acknowledged receipt. Following the invocation of the ROFR, Shonk and Carbon engaged in the mutual drafting of the transaction documents. Shonk continued to request that Carbon produce the underlying information supporting the allocated values Diversified was willing to pay for the Lease interests. While a portion of the Allocated Value Schedule, prepared by Diversified, was eventually provided to Shonk, all three

17

Petitioners admittedly denied Shonk access to the full schedule and other exhibits to the MIPA. While this dispute between Shonk and Carbon continued, CEC completed the sale to Diversified, which included the transfer of the Leases at issue.

Shonk maintained at trial that it validly exercised its ROFR and that Carbon, through CEC, was not free to close on the Diversified acquisition of the Leases without giving Shonk a chance to buy the interests at the same values set between the Petitioners. In doing so, Carbon and CEC, through its guaranty agreement, breached the Second Lease Amendment. That breach, under the terms of the ROFR, resulted in a forfeiture of the Leases at issue, including all machinery and equipment therewith. This issue was submitted to the jury, and a verdict was returned in Shonk's favor. The circuit court found the jury's verdict supported by the record, and we find no error in the circuit court's assessment.

In determining whether the verdict of a jury is supported by the evidence the SCAWV has noted that "every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true." Syl. Pt. 8, *Marsch v. Am. Elec. Power Co.*, 207 W. Va. 174, 530 S.E.2d 173 (1999) (per curiam) (quoting Syl. Pt. 3, *Walker v. Monongahela Power Co.*, 147 W. Va. 825, 131 S.E.2d 736 (1963)). Syllabus Point 2 of *Tanner v. Rite Aid of West Virginia, Inc.* provides the four-part guidance in assessing whether a jury's verdict is supported by the evidence:

18

In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

194 W. Va. 643, 461 S.E.2d 149 (1995) (quoting Syl. Pt. 6, *McClung v. Marion County Comm'n*, 178 W. Va. 444, 360 S.E.2d 221 (1987)).

Based upon our review of the record, we find that there was sufficient evidence to support the jury's determination that Carbon understood that the transfer of the Leases to Diversified required compliance with the ROFR. There is no dispute that Shonk timely exercised its rights under the ROFR. The principal purpose for this ROFR was to provide Shonk an ability to maintain its Leases of the property with Carbon, the party that was contractually obligated to perform, and no other, unless Shonk chose to allow a transfer of the Leases to another party Shonk deemed as, or more, responsible than Carbon.

Petitioners' argument that the closing of the transaction with Diversified came with no detriment to Shonk plainly ignores the stated purpose for the ROFR. Shonk's leverage under the ROFR was significantly diminished as a result of the transfer to Diversified. Because of this transfer, Shonk could no longer force Carbon to comply with any provisions under the Second Lease Amendment, and Shonk lost CEC's guaranty of Carbon's performance. It is clear that Shonk reasonably expected and was entitled to

receive the transactional benefits it negotiated with Carbon, not Diversified. By Carbon's

effective transfer of the Leases to Diversified, Shonk was denied such benefits. Shonk

stood in an entirely different position post-acquisition. Accordingly, we find a reasonable

jury could conclude that by transferring the Leases to Diversified, Carbon breached the

ROFR, triggering forfeiture pursuant to the Second Lease Amendment.

Additionally, Shonk alleges that Carbon breached the ROFR by failing to

provide sufficient information concerning the values it expected to receive for the leases at

issue.[7] Petitioners allege that under the Second Lease Amendment, they were only required

to provide Shonk the identity of the proposed transferee and the value Carbon expected to

receive. Again, we disagree. Under the ROFR, Carbon was contractually obligated to

provide Shonk "information concerning . . . the value [it] expects to receive in exchange

for transferring the Transferred Interest." In resolving the parties' summary judgment

motions, the circuit court determined that the ROFR was ambiguous as to the scope of

information Carbon was required to provide to Shonk. Petitioners have not challenged this

determination on appeal. Thus, we find that a factual question was present as to whether

such actions of Carbon satisfied the language in the Second Lease Amendment. *See* Syl.

Pt. 4, *Harrell v. Cain*, 242 W. Va. 194, 832 S.E.2d 120 (2019) ("If a circuit court finds that

a . . . contract . . . is ambiguous and does not clearly express the intention of the parties,

---

[7] While we do not need to establish support for all alleged breaches of contract as support for one breach of contract affirms the jury's verdict regarding the forfeiture, we will briefly address the requisite disclosure of information.

then the proper interpretation of that ambiguous document, when the facts are in dispute, presents a question of fact for the factfinder to resolve after considering all relevant extrinsic evidence."). The language of the ROFR clearly required disclosure of information necessary to the allocation of value. The exchange of confidential information was expressly contemplated. Carbon was to provide information necessary for Shonk to understand who was purchasing and under what terms and conditions. Following the initial request and denial of such information, Shonk exercised its option to purchase subject to the same terms and conditions as Diversified. Some limited information concerning the valuations of the Leases was provided, including a redacted Allocated Value Table. The question of whether Carbon provided sufficient information under the ROFR was properly submitted to the jury, which returned a verdict finding that Carbon committed a material breach by withholding required information. Thus, we conclude that the jury's verdict on Shonk's claims for breach of contract and implied covenant are not plainly contrary to the weight of the evidence and are sufficiently supported by the evidence at trial. Therefore, we find no error in the circuit court's denial of Petitioners' post-trial motion for judgment on this issue.

## B. Willful Trespass

Petitioners contend that the jury below lacked any evidentiary basis to conclude that Carbon's continued operation of the wells following Shonk's forfeiture notice was done intentionally or recklessly as required to establish a willful trespass. We disagree. A willful trespass requires actions that are performed "intentionally or recklessly

21

with intent to 'take an unconscientious advantage of his victim[.]'" *Reynolds v. Pardee & Curtin Lumber Co.*, 172 W. Va. 804, 809, 310 S.E.2d 870, 876 (1983) (quoting *Pan Coal Co. v. Garland Pocahontas Coal Co.*, 97 W. Va. 368, 381, 125 S.E. 226, 231 (1924)). "One who, with knowledge that he is invading the rights of another, extends, or permits the extension of, a mine which he is operating upon his own property into land owned by another, and operates or permits its operation there is a 'willful trespasser' within the meaning of the law." *Reynolds*, 172 W. Va. 804, 310 S.E.2d 870, syl. pt. 3 (quoting Syl. Pt. 2, *Petrelli v. West Virginia-Pittsburgh Coal Co.,* 86 W. Va. 607, 104 S.E. 103 (1920)). In West Virginia, trespassers have been divided into two classes for purposes of damages: innocent and willful. Whether a trespass was willful or innocent turns on intent. *See* Syl. Pt. 10, *Pan Coal Co. v. Garland Pocahontas Coal Co.,* 97 W. Va. 368, 125 S.E. 226 (1924). The type of notice given to the alleged trespasser may be considered as one of the factors in deciding the innocence of a trespass, but it is not singularly determinative. *Reynolds*, 172 W. Va. at 809, 310 S.E.2d at 876. If a trespass was intentional, the measure of damages is the value of the gas extracted without any deduction for operating expenses. Damages for an innocent trespass are measured by the value of the extracted gas after deducting operating expenses. *See* Syl. Pt. 7, *Bethlehem Steel Corp. v. Shonk Land Co.*, 169 W. Va. 310, 288 S.E.2d 139 (1982).

On May 26, 2020, Shonk informed Petitioners that it considered the wells at issue as forfeited pursuant to the Second Lease Amendment signed by Carbon. Despite this notice, Carbon (and, effectively, CEC and Diversified) continued to operate the wells. The

jury found that Carbon intentionally trespassed on the leased property by the continuation of their operations, and thus awarded Shonk $1,596,847 in damages. This award represented the gross revenue from the natural gas produced from these wells from June 2020 through April 2022, without any deduction for the operating expenses incurred in the production of that gas.

Obviously, Petitioners and Shonk have starkly different versions of the events that occurred and dispute the level of culpability each should bear as a result. These disputed narratives are within the province of the jury to resolve. Whether a trespasser acted in good faith is a question of fact determined from all facts and circumstances in the case. The SCAWV has long held that "[i]t is the peculiar and exclusive province of the jury to weigh the evidence and to resolve questions of fact when the testimony of witnesses regarding them is conflicting and the finding of the jury on such facts will not ordinarily be disturbed by this Court." Syl. Pt. 5, *Marsch*, 207 W. Va. at 177, 530 S.E.2d at 176. Further, the Court has concluded that "[w]hen a case involving conflicting testimony and circumstances has been fairly tried, under proper instructions, the verdict of the jury will not be set aside unless plainly contrary to the weight of the evidence or without sufficient evidence to support it." *Id.*, Syl. Pt. 6 (quoting Syl. Pt. 2, *Walker v. Monongahela Power Co.*, 147 W. Va. 825, 131 S.E.2d 736 (1963) (internal citation omitted)).

In light of the circumstances surrounding Shonk and Carbon's contractual relationship, a reasonable jury could find that Shonk provided sufficient notice to Carbon

23

of its position of forfeiture and that Carbon's continued operation of the wells was intentionally done and was a disadvantage to Shonk. It was within the jury's province to conclude that Carbon had no good-faith basis to continue the operations under the Leases and that such operation was done with intent to take advantage of the situation and the current market. We find no reason to disturb the jury's factual determination and find the same supported by evidence in the record. Accordingly, we see no error in the circuit court's entry of judgment on the jury's finding of willful trespass and the corresponding award of $1,596,847 in damages, and we likewise find no error in the circuit court's denial of Petitioners' post-trial motions related to this issue.

### C. Unjust Enrichment

Next, Petitioners argue that the jury's verdict in favor of Shonk on its unjust enrichment claim is a double recovery and that no evidence was presented showing that Carbon retained a benefit to which Shonk would have been entitled under the ROFR. Further, Petitioners argue that there was no evidence to support the jury award for unjust enrichment of $1,302,803. Based on our review of the record, we agree.

An action for unjust enrichment is quasicontractual in nature. *See Warrior Oil & Gas, LLC v. Blue Land Servs., LLC*, 248 W. Va. 1, 9, 886 S.E.2d 336, 344 (2023). "As a species of quasi contract relief, unjust enrichment does not exist to provide an alternative means of recovery for breach of contract, nor does it exist to reduce contract disputes to a question of whether one party benefitted from the other party's performance."

24

Syl. Pt. 3, *Gulfport Energy Corp. v. Harbert Priv. Equity Partners, LP*, 244 W. Va. 154, 851 S.E.2d 817 (2020). "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Id*. at Syl. Pt. 2.

Shonk's recovery under the doctrine of unjust enrichment is grounded in the allegation that Carbon deprived them of a $1,302,803 benefit. This deprivation and associated damages were expressly the subject of Shonk's breach of contract claim. As such, we find that Shonk's claim for unjust enrichment falls squarely within the subject matter contained in the Second Lease Amendment (the subject of Shonk's breach of contract claims) and should not be invoked to provide an alternate means of recovery. The nature of the unjust enrichment claim can "only exist in the absence of an agreement." *Gulfport*, 244 W. Va. at 160, 851 S.E.2d at 823.

Shonk argues that the jury's award for unjust enrichment represented the value for the real property that Carbon unjustly retained, and that this land value was distinct from any value associated with the improper well operations awarded under the willful trespass claim. We do not agree. Shonk's argument is unsupported by its pleadings in the underlying matter. Count X of Shonk's Amended Complaint specifically references Shonk's lost benefit arising from Carbon occupying and using the land for further well operations without consent, and that "Carbon West Virginia has and is knowingly accepting and retaining benefits through its unauthorized operations on Shonk's property

25

under circumstances that it would be inequitable and unconscionable to permit Carbon West Virginia to retain those benefits." Any right of recovery under the doctrine of unjust enrichment is essentially equitable; its basis being that in "a given situation it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff." *Somerville v. Jacobs*, 153 W. Va. 613, 623, 170 S.E.2d 805, 810–11 (1969). Thus to establish such recovery, Shonk was required to provide evidence of a benefit that Carbon retained at Shonk's expense. The record simply does not support a finding that Carbon retained any benefit, outside the damages associated with the independently raised willful trespass claim and breach of contract claims.

Moreover, we find that the record fails to support the valuation assigned to any form of alleged unjust enrichment. The jury awarded Shonk $1,302,803, to represent an allocated value ascertained by a methodology used to value other developed leases, which were beyond the scope of this transaction. There is no evidence to establish that this amount was properly allocated to any unjustly retained benefit, whether such benefit was based in real or personal property. Therefore, in the absence of any distinct enrichment separate from the contractual claims and proof of a retained benefit by Carbon, we find as a matter of law that Carbon was not unjustly enriched. Accordingly, the circuit court should have found the jury's unjust enrichment verdict was not supported by the record, and the circuit court erred when it denied the Petitioners' post-trial motion regarding unjust enrichment.

26

## D. Tortious Interference

Petitioners further argue that the jury lacked any evidentiary basis to conclude that Shonk met all required elements to prevail on its tortious interference claim against Diversified. Additionally, Petitioners claim that the evidence fails to support the damages awarded by the jury for that claim. We agree. In order for a party to be held liable for tortious interference with a contractual relationship, the party must be someone outside of the contractual relationship. In Syllabus Point 2 of *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 173 W. Va. 210, 314 S.E.2d 166 (1983), the SCAWV set forth the essential elements of a claim for tortious interference with a contract or business relationship:

> To establish prima facie proof of tortious interference, a plaintiff must show:
>
> (1) existence of a contractual or business relationship or expectancy;
> (2) an intentional act of interference by a party outside that relationship or expectancy;
> (3) proof that the interference caused the harm sustained; and
> (4) damages.

Essential to these elements of tortious interference is the proof that the interference caused the harm allegedly sustained. To establish such proof, Shonk was required to show that it actually sustained harm from the alleged intentional actions of Diversified and that the damages accurately reflect the amount of harm. In reviewing the record, we find the jury's finding of harm and the corresponding award of $1,280,504 lacks evidentiary support.

"[I]t has been said that a person who comes to an appellate court with a verdict of a jury, approved by the trial court, is in the strongest position known to the law." *Bower v. Brannon*, 141 W. Va. 435, 440, 90 S.E.2d 342, 346 (1955). However, if there is "no evidence to support the verdict of a jury, or if it is against the plain preponderance of conflicting evidence, it must be set aside." *Quality Bedding Co. v. Am. Credit Indem. Co. of New York*, 150 W. Va. 352, 361, 145 S.E.2d 468, 474 (1965). Here, the ROFR, which Diversified is alleged to have interfered with, contained a contractual remedy in the event of a breach, specifically the forfeiture of the Leases. There is no evidence to support a finding that Shonk would have received any amount of money resulting from the ROFR's performance, much less the specific amount of $1,280,504. By acquiring the Leases through forfeiture, Shonk received the only benefit it was contractually obligated to receive.

Further, we find that the record does not support the jury's determination that $1,280,504 was the fair and equitable price of the Leases. This amount represents the allocated value assigned to a set of 60 wells governed by a completely different lease, which was a part of the larger Diversified acquisition. Nothing in the evidence supports a claim of any ownership interest by Shonk in that separately valued lease which would justify the awarded amount. Therefore, we find the amount of the jury's award in this regard does not relate to any damages necessary to remedy any alleged interference with

28

an intended benefit. Accordingly, we reverse the jury's verdict and the circuit court's denial

of Petitioners' post-trial motion regarding tortious interference.[8]

## E. Slander of Title

Petitioners allege that the jury's verdict on Shonk's claim for slander of title

is unsupported by the evidentiary record as Shonk introduced no evidence for the

determination and valuation of special damages, as required under West Virginia law.

Based upon our review of the record, we agree.[9] Slander of title has been recognized in

West Virginia as a common law cause of action. *Restatement (Second) of the Law of Torts*

§ 623A (1977) provides:

---

[8] We note that one cannot be liable for interference that is negligent rather than intentional, or if one shows defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper. *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 223 W. Va. 259, 262, 672 S.E.2d 395, 398 (2008) (citing Syl. Pt. 2, *Torbett*, 173 W. Va. 210, 314 S.E.2d 166). Here, Shonk argued that Diversified committed intentional interference through inflating the value of the Leases and misleading Shonk on how they came up with the price offered for the purchase. The basis for this argument was an open-ended invitation for the jury to find a legal duty, which the law does not recognize. Here, Diversified owed no duty of good faith to Shonk. Diversified was in legitimate competition with Shonk to acquire the Leases. Any action taken by Diversified was clearly in furtherance of its financial interests while engaged in this competition for the Leases.

[9] Petitioners argue the recorded assignment at issue is not a publication as it makes no expressed reference to the Leases forfeited to Shonk and that their actions were not malicious and could not be viewed as derogatory. However, we limit our review here to the propriety of the circuit court's decision regarding the requirements of special damages and diminished value in a slander of title action and find that our ruling on those issues is dispositive of the assignment of error raised by the Petitioners on appeal.

One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

Expanding on these principles, the SCAWV addressed the elements necessary for one claiming slander of title in Syllabus Point 2 of *TXO Production Corp. v. Alliance Resources Corp.*, 187 W. Va. 457, 419 S.E.2d 870 (1992):

The elements of slander of title are:

1. publication of
2. a false statement
3. derogatory to plaintiff's title
4. with malice
5. causing special damages
6. as a result of diminished value in the eyes of third parties.

The tort of slander of title is based on an intentional interference with economic relations. Two elements are essential for maintaining an action for slander of title: proof of special damages and a palpable injury such as diminished value. In these types of claims, special damages are ordinarily proved by evidence of a lost sale or the loss of some other pecuniary advantage. Absent a specific monetary loss flowing from a slander affecting the marketability or use of the property, there is no damage. Ordinarily, attorney's fees are not considered damages. However, "[a]ttorneys' fees incurred in removing spurious clouds from a title qualify as special damages in an action for slander

of title." Syl. Pt. 6, *TXO Prod. Corp.,* 187 W. Va. at 460, 419 S.E.2d at 873. In *TXO*, the SCAWV found that the appellees presented sufficient evidence of TXO's pattern and practice in recording false quitclaim deeds which forced the appellees to expend considerable resources to remove the apparent cloud on their title. Specifically, the appellees in *TXO* showed that they incurred $19,000 in attorneys' fees because of TXO's actions. Evidence of this valuation of fees was permitted to establish special damages, in that these fees were capable of an application to the diminution of the overall value. Conversely, here, Shonk failed to provide any such evidence.

While the circuit court below was free to conduct a post-trial hearing regarding the reasonableness of the attorneys' fees valuation, that did not alleviate Shonk of the responsibility to show evidentiary support and provide a foundation for its alleged special damages at trial and before the jury. This essential element was required before the jury could find that special damages were incurred as a result of the Petitioners' actions. Without Shonk providing such evidence of the damages related to the alleged slander of title, we are unable to find an evidentiary basis to determine that a diminished value occurred. The circuit court's review of the fairness of a party's attorneys' fees post-trial does not circumvent the necessity of proof as to the party's right to recover those fees, as that proof is an essential element of the claim. Nothing in the record suggests the Petitioners waived presentation of this element to the jury. Accordingly, as a matter of law, we must reverse the jury's verdict and the circuit court's denial of Petitioners' post-trial motion regarding slander of title.

In conjunction with our analysis above, we note that "[a]n action in tort will not arise for breach of contract unless the action in tort would arise independent of the existence of the contract." *CIT Bank, N.A. v. Coffman*, 250 W. Va. 464, 477, 904 S.E.2d 466, 479 (Ct. App. 2024). This rule, known as the "gist of the action doctrine," generally precludes a plaintiff from recovering additional tort damages arising out of a breach of contract claim. "Succinctly stated, whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are defined by the terms of the contract." *Gaddy Eng'n Co. v. Bowles Rice McDavid Graff & Love, LLP*, 231 W. Va. 577, 586, 746 S.E.2d 568, 577 (2013). The gist of the action doctrine prevents a breach of contract claim from being pled as a tort claim. *CIT Bank,* 250 W. Va. at 476, 904 S.E.2d at 478. Under this doctrine, recovery in tort will be barred when the following factors are demonstrated:

> (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*CIT Bank, N.A.*, 250 W. Va. at 477, 904 S.E.2d at 479. After a review of Shonk's claim for slander of title, it is apparent that such claim falls expressly within the class of claims precluded by the gist of the action doctrine. The liability associated with Shonk's claim for slander of title arises solely from the breach of the ROFR provision contained in the Second Lease Amendment between Shonk and Carbon and its success is entirely dependent upon the breach of contract determination. Accordingly, we find that the circuit court erred in

32

denial of Petitioners' post-trial motion on this issue and in awarding Shonk special damages, including attorneys' fees.

## F. New Trial

Lastly, Petitioners claim that the circuit court erred in not granting them a new trial. Petitioners argue that they are entitled to a new trial because the damages awarded by the jury were duplicative and unsupported by the evidence. They also argue that prejudice influenced the jury's decision, as Shonk's counsel was permitted to make improper arguments that it has been cheated and was a victim of fraud. We disagree.

Rule 59 of the West Virginia Rules of Civil Procedure (1998)[10] authorizes a circuit court to grant a new trial "to all or any of the parties and on all or part of the issues […] in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law[.]" A trial judge's decision to deny or award a new trial is "not subject to appellate review unless the trial judge abuses his or her discretion." *Maynard v. Adkins*, 193 W. Va. 456, 459, 457 S.E.2d 133, 136 (1995). A new trial should rarely be granted and then granted only where it is "reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *In re State Public Building Asbestos Litigation,* 193 W. Va. 119, 124, 454 S.E.2d 413, 418

---

[10] We note that the circuit court considered Petitioners' motions under the 1998 version of Rule 59. We are directed to nothing in the 2025 version of this Rule that would alter our decision.

(1994) (internal citation omitted). An appellate court's review of the circuit court's decision is very limited. *See Id.* As Justice Cleckley noted in his concurring opinion in the *Asbestos Litigation* case: "We merely are upholding the right of a trial court to grant a new trial when it believes that substantial justice has not been done on the theory that it is an exercise of the trial court's inherent power." 193 W. Va. at 131 n.1, 454 S.E.2d at 425 n.1 (Cleckley, J., concurring).

A review of the record below does not indicate that a substantial injustice has occurred requiring this Court to overrule the circuit court's broad discretion in awarding a new trial. As discussed above, we found the jury's verdicts on Shonk's breach of contract and willful trespass claims to be supported by the evidentiary record on review. While, as a matter of law, we have reversed the jury's verdicts on tortious interference, unjust enrichment, and slander of title, our actions do not mandate that a new trial is necessary. Rather, we find that the issues now raised by Petitioners were capable of being appropriately addressed by post-trial motions and appeals.

In considering the propriety of the remarks made by Shonk's counsel during closing argument, we are mindful that such arguments are not in themselves evidence and trial judges are given considerable latitude in determining the propriety of argument by trial counsel. *See Smith v. Andreini*, 223 W. Va. 605, 616, 678 S.E.2d 858, 869 (2009). As the SCAWV held in Syllabus Point 9 of *Foster v. Sakhai*, 210 W. Va. 716, 559 S.E.2d 53 (2001):

34

> "The discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom." Syl. pt. 3, *State v. Boggs*, 103 W.Va. 641, 138 S.E. 321 (1927).

The purpose of closing arguments is not only to summarize the evidence, but to afford counsel the opportunity to persuade jurors, within acceptable boundaries, to view the evidence in the light most favorable to their client. Thus, advocates are given great latitude in arguing their cases but are also required to "keep within the evidence and not make statements calculated to inflame the minds of jurors and tending to induce verdicts warped by prejudice[.]" *State v. Kennedy*, 162 W.Va. 244, 249, 249 S.E.2d 188, 191 (1978) (quoting *State v. Lohm*, 97 W.Va. 652, 663, 125 S.E. 758, 762 (1924)). In reviewing the closing argument of Shonk's counsel, we find that the trial court did not abuse its discretion in denying a new trial on such proposed basis. Accordingly, we affirm the circuit court's denial of the Petitioners' motion for new trial.

## IV. CONCLUSION

For the foregoing reasons, we affirm, in part, the October 6, 2023, Judgment Order and the March 21, 2024, Order Resolving Defendants' Post-Trial Motions regarding the claims for breach of contract with the associated forfeiture and willful trespass with the corresponding amount of $1,596,847 and the denial of Petitioners' motion for new trial. We reverse, in part, the October 6, 2023, Judgment Order and the March 21, 2024, Order Resolving Defendants' Post-Trial Motions regarding the claims for tortious interference in

35

the amount of $1,280,504; unjust enrichment in the amount of $1,302,803; and slander of title.

Affirmed, in part, and Reversed, in part.